**ASSOCIATED INDUSTRIES OF NEW YORK STATE, Inc., v. ICKES, Secretary of the Interior, et al.**

Circuit Court of Appeals, Second Circuit.

Feb. 8, 1943.

696

LeBoeuf & Lamb, of New York City (Horace R. Lamb, of New York City, James S. Brock, of Brooklyn, and Homer Crawford, of New York City, of counsel), for petitioner.

Warner W. Gardner, Arnold Levy, Jesse B. Messitte, and Erwin B. Ellmann, all of Washington, D. C., for respondent.

Before SWAN, AUGUSTUS N. HAND and FRANK, Circuit Judges.

FRANK, Circuit Judge.

Petitioner, Associated Industries of New York, Inc., is a New York membership corporation, the members of which are New York industrial and commercial firms and corporations, many of which are substantial consumers of coal. It has filed a petition here to review orders made by respondents under the purported authority of the Bituminous Coal Act of 1937, 15 U.S.C.A. § 828 et seq. Respondents are the successors of the former National Bituminous Coal Commission, which was abolished in 1939, under the terms of the President's Reorganization Plan No. II, effective July 1, 1939, 53 Stat. 1433, 5 U.S.C.A. following section 133t, pursuant to the Reorganization Act of 1939, Public Resolution 19, 53 Stat. 561, when its functions were transferred to a bureau in the Department of Interior, designated by the Secretary of the Interior, that bureau being called the Bituminous Coal Division. Respondent Ickes is the Secretary of the Department of Interior. Respondent Wheeler is Director of the Bituminous Coal Division. We shall at times refer to the respondents as the "Commission," both in the interest of convenience, and because the Act retains that term. · The orders in question direct the increase, by 20 cents per ton, of the minimum prices for bituminous coal, produced in Minimum Area No. 1,[1] and sold in a designated market area which includes New York State.

On May 15, 1938, the Commission began a proceeding entitled General Docket No. 15, in order to carry out the provisions of the Act which call for the establishment of minimum prices.[2] After extensive hearings, the Commission made determinations of the weighted average costs of producing coal in each production district. These figures were submitted to the district boards,[3] which in turn suggested prices

---

[1] See footnote 3.

[2] § 4 II(a) of the Act provides that "* * * each district board shall determine, from cost data submitted by the proper statistical bureau of the Commission, the weighted average of the total costs of the ascertainable tonnage produced in the district in the calendar year 1936. * * * Such determination and the computations upon which it is based shall be promptly submitted to the Commission by each district board in the respective minimum-price area. The Commission shall thereupon determine the weighted average of the total costs of the tonnage for each minimum-price area * * * and transmit it to all the district boards within such minimum-price area. Said weighted average of the total costs shall be taken as the basis, to be effective until changed by the Commission, for the proposal and establishment of minimum prices." § 4 II(b) of the Act requires the district boards to "coordinate in common consuming market areas upon a fair competitive basis," the minimum prices thus proposed. The Commission then may establish minimum prices on the basis of such proposed coordinate prices. The Commission is also directed "from time to time * * * review and revise the effective minimum prices."

[3] § 4, pt. 1, of the Act provides for the organization of producers of coal, as members of the bituminous coal code, into 23 district boards of code members, each board to consist of "not less than three nor more than seventeen members." The district boards are charged with the function of proposing "reasonable rules and

and price classifications for their respective districts as a basis for the coordination of prices among the various districts. A hearing was held on these proposals and, in December 1938 and January and February 1939, the Commission issued orders, establishing the minimum prices and price classifications, on which basis prices were to be coordinated. In order to fix coordinated price schedules, the final step in the price-fixing process, hearings were instituted in May 1939, and the trial examiners submitted their recommendations in March and April 1940 to the then Director of the Bituminous Coal Division. In May and June, 1940, he heard the arguments of approximately 289 petitioners, and, after reviewing the record, issued findings of fact and conclusions of law, and established minimum prices based thereon. Exceptions were filed with respondent Ickes, who, on September 24, 1940, approved them subject to certain modifications. On October 1, 1940, the prices finally became effective upon the order of respondent Ickes.

General Docket No. 21—in which the orders sought to be reviewed were made on August 28 and September 30, 1942—was a proceeding instituted by the Commission "for the purpose of revising the present minimum prices heretofore established in General Docket No. 15 * * *" A hearing was initiated on May 21, 1941, before an examiner of the Commission to determine the nature and extent of cost changes. Appearances were entered on behalf of the District Boards, 115 code members and 225 other persons, including the petitioner. Petitioner was served with notice of the hearing and actively participated therein. Petitioner after entering its appearance was granted leave to file a list of its members. The examiner submitted his report and respondent, Wheeler, the Director of the Commission, after hearing arguments thereon, issued determinations of the weighted cost of production in the various minimum price areas. Respondent Ickes then reviewed, at the behest of the petitioner and others, the methods and standards which Wheeler had employed in determining weighted average cost increases, and in an opinion dated April 13,

1942, held them to be suitable and proper. Hearings on the problem of adjustment of minimum prices, in the light of the changes that had taken place, were begun on May 5, 1942. Here also, petitioner entered an appearance and actively participated. On July 27, 1942, the examiner recommended that effective minimum prices established in General Docket No. 15 for Minimum Price Area I, for shipments into Market Areas 2 and 4, be increased by 20 cents per ton. Petitioner and others filed exceptions, and after hearing oral arguments and considering the briefs filed, the Director, on August 28, 1942, adopted the examiners' report subject to certain modification. At the same time he ordered the revised minimum prices to become effective on October 1, 1942. Petitioner and other participants in the proceedings then obtained a review by respondent Ickes of certain questions of law and policy. On September 30, 1942, he issued an order, affirming the determinations of the Director on such matters as were within the scope of the review. Pursuant thereto and to the Director's order of August 28, 1942, the adjusted minimum prices went into effect on October 1, 1942.

In the course of proceedings leading up to these orders, petitioner was permitted to examine witnesses, file briefs and make oral arguments; the Director in an order stated, "Associated Industries of New York State, Inc., has made a written request * * *"; the Acting Director in findings of fact expressly referred to exceptions and arguments made by petitioner, naming it; the Director noted contentions made by "two representatives of consumer interests, namely Bituminous Coal Consumers' Counsel and Associated Industries of New York"; respondent Ickes, in an order and opinion, discussed at length contentions advanced by petitioner, naming it repeatedly; a trial examiner stated in his report that "the consumer interests were also represented by counsel for the Associated Industries."

This petition seeks review under Section 6(b) of the Act, of the two orders of August 28, 1942 and September 30, 1942. It alleges, inter alia, that, in promulgating them, the respondents acted beyond the

regulations incidental to the sale and distribution, by code members within the district, of coal." § 4, pt. 2(a). A schedule of districts may be found in the Annex to the Act, following 15 U.S.C.A. § 851. The Districts, in turn, are grouped into ten minimum price areas "corresponding

roughly to the scope of the several wage contracts between operators and the union." Rostow, Bituminous Coal & the Public Interest, 50 Yale L.J. 543, 568 (1941). The appendix to § 4 II(a) contains a table of the minimum price areas.

scope of the authority conferred upon them by the Act, and that the orders were based on findings of fact which are not supported by substantial evidence. The respondents have moved to dismiss the petition for want of jurisdiction.

The record is exceedingly voluminous and neither party has, in connection with this motion, given us any citations to any portions thereof. We have therefore not undertaken, at this time, to examine the record, but have relied, as to record facts pertinent on this motion, on statements of fact in the briefs of one party when not contradicted by the other.

■ 1. By its very nature, respondents' motion to dismiss the petition requires us to assume, merely arguendo of course, that the situation is just as it would be if we had heard petitioner on the merits and were satisfied that respondents' orders were invalid because made in violation of respondents' statutory powers and for the precise reasons set forth in the petition. The motion to dismiss is not based on any contention as to the general non-reviewability of the orders or their validity, but solely on the contention that, assuming them to be invalid and reviewable, petitioner is not the kind of person entitled to seek court review. Respondents' basic position is frankly that consumers of coal can never appear in court to complain of such price-fixing orders, even if invalid, no matter how great the financial burdens imposed on those consumers by the increase in the cost of coal which will result from those orders. Respondents enthusiastically grant that Congress intended in the Act to safeguard the interests of consumers, but respondents say that those interests are, for purposes of court review, exclusively represented by a government official, the Bituminous Coal Consumers' Counsel, appointed pursuant to § 2(b) of the Act,[4] and that that official, while authorized to do so, has not sought court review of these orders.

2. Section 6(b) of the Act expressly authorizes "any person aggrieved by an order issued by the Commission in a proceeding to which such person is a party" to seek review by a petition in an appropriate United States Circuit Court of Appeals. There is no possibility of denying that respondents, in the administrative proceedings which led to these orders, recognized petitioner as a party representing consumers. Respondents, in their briefs, indeed, ask us to assume, for purposes of this motion, that petitioner was thus a party.

■ Respondents, however, insist that petitioner is not a "person aggrieved" by the orders. They assert that those words mean merely to describe the kind of persons who, in the absence of § 6(b), would have had a "standing" to maintain a suit in a district court seeking to enjoin respondents from enforcing its order or a declaratory judgment with respect to the validity of those orders. In considering that contention, it is necessary to have in mind that an action in a Court of Appeals to review administrative orders under such a provision as that contained in § 6(b) is a suit begun in an appellate court, i. e., that such provision has the effect of conferring original jurisdiction upon an appellate court; such a proceeding is some-

---

[4] Sec. 2(b) of the Act of 1937 established "an office in the Department of the Interior to be known as the office of the consumers' counsel of the National Bituminous Coal Commission." The Counsel was to be appointed by the President, with the consent of the Senate. He was empowered to conduct such independent investigations as were necessary to "enable him properly to represent the consuming public in any proceeding before the Commission." He was further authorized to appoint necessary professional and clerical assistants.

On July 1, 1939, pursuant to the provisions of Reorg. Plan No. II, § 4(c), 5 U. S.C.A. following section 133t, the office of Consumers' Counsel of the National Bituminous Coal Commission was abolished and its functions transferred to the office of the Solicitor of the Department of the Interior.

It was not until the subsequent passage of § 22 of the Act, 15 U.S.C.A. § 852, in 1941, that the present independent character of the office of the consumers' counsel was fully established. That section established the office of the Bituminous Coal Consumers' Counsel. This new office is expressly made a part of the executive branch of the government. The counsel is appointed by the President, subject to the consent of the Senate. All the functions formerly conferred upon the Consumers' Counsel of the National Bituminous Coal Commission, which were transferred by Reorganization Plan No. II to the office of the Solicitor of the Department of the Interior, were, by this section, conferred upon the office of the Bituminous Coal Consumers' Counsel.

times called an "appeal" but it is, of course, not the equivalent of an appeal from a lower court, since the proceedings under review were not judicial.[5] In the absence, then, of an appropriate statutory provision, such as § 6(b) of the act here, a suit of this kind, assailing administrative orders, could be brought only in a district court. In other words, the review proceeding is, in effect, a substitute for a district court injunction or declaratory judgment suit. It follows that the doctrine of so-called "standing to sue," [6] as worked out in district court injunction or declaratory judgment suits against government officers, is applicable to the present review proceedings.

 That doctrine, as ordinarily applied, may be summarized as follows: In a suit in a federal court [7] by a citizen against a government officer, complaining of alleged past or threatened future unlawful conduct by the defendant, there is no justiciable "controversy," without which, under Article III, § 2 of the Constitution, the court has no jurisdiction, unless the citizen shows that such conduct or threatened conduct invades or will invade a private substantive legally protected interest of the plaintiff citizen; such invaded interest must be either of a "recognized" character,[8] at "common law" or a substantive private legally protected interest created by statute.[9] In other words, unless the citizen first shows that, if the defendant were a private person having no official status, the particular defendant's conduct or threatened conduct would give rise to a cause of action against him by that particular citizen, the court cannot consider whether the defendant officer's conduct is or is not authorized by statute; [10] for the statute comes into the case, if at all, only by way of a defense or of justification for acts of the defendant which would be unlawful as against the plaintiff unless the defendant had official authority, conferred upon him by the statute, to do those acts.[11] Unless, then, the citizen first shows that some substantive private legally protected interest possessed by him has been invaded or is threatened with invasion by the defendant officer thus regarded as a private person, the suit must fail for want of a justiciable controversy, it being then merely a request for a forbidden advisory opinion.[12] That the plain-

---

[5] Federal C. C. v. Pottsville Broadcasting Co., 309 U.S. 134, 141–145, 60 S.Ct. 437, 84 L.Ed. 656.

A "constitutional" federal court (as distinguished from "legislative" courts or those which, like the courts of the District of Columbia, are both "legislative" and "constitutional" courts) cannot, constitutionally, because of Article III, § 2 of the Constitution, be given power to sit in judgment and revise administrative action, since then there is no justiciable "controversy"; the issues before such a court on such a review must therefore be restricted to those relating to conformity by the administrative officials with their statutory powers and duties. Keller v. Potomac Elec. Co., 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731; Federal Radio Comm. v. Nelson Bros. Co., 289 U.S. 266, 53 S.Ct. 627, 77 L. Ed. 1166, 89 A.L.R. 406; Federal C. C. v. Pottsville Broadcasting Co., supra; cf. O'Donoghue v. United States, 289 U. S. 516, 53 S.Ct. 740, 77 L.Ed. 1356.

[6] The phrase is perhaps not too felicitous, for anyone has, in a certain sense, a "right" to bring any kind of suit in any court; a man can institute an original action for divorce in the Supreme Court; his suit will be dismissed but he will only suffer costs, just as he would if he brought a suit in a court of proper jurisdiction and lost on the merits.

[7] Subject to the exceptions indicated in note 5, supra.

[8] Perkins v. Lukens Steel Co., 310 U. S. 113, 125, 60 S.Ct. 869, 84 L.Ed. 1108.

[9] See, e. g., American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90; Tennessee El. Power Co. v. T. V. A., 306 U.S. 118, 137, 138, 59 S.Ct. 366, 83 L.Ed. 543; cf. comment on Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667, in Alabama Power Co. v. Ickes, 302 U.S. 464, 483, 484, 58 S.Ct. 300, 82 L.Ed. 374.

[10] Of course, the discussion here is not applicable to a suit by a citizen to compel an officer affirmatively to perform a plain ministerial duty owed to that citizen. See, e. g., Board of Liquidation v. McComb, 92 U.S. 531, 541, 23 L.Ed. 623.

[11] See, e. g., Cunningham v. Macon & Brunswick R. Co., 109 U.S. 446, 456, 3 S.Ct. 292, 27 L.Ed. 992; Poindexter v. Greenhow, 114 U.S. 270, 287, 330, 5 S. Ct. 903, 962, 29 L.Ed. 185, 207; Ex parte La Prade, 289 U.S. 444, 455, 53 S.Ct. 682, 77 L.Ed. 1311. See discussion in Hammond-Knowlton v. United States, 2 Cir., 121 F.2d 192, 194, 195 and notes 5 and 7.

[12] Cf. Ætna Life Ins. Co. v. Haworth,

tiff shows financial loss on his part resulting from unlawful official conduct is not alone sufficient, for such a loss, absent any such invasion of the plaintiff's private substantive legally protected interest, is damnum absque injuria. Thus, for instance, financial loss resulting from increased lawful competition with a plaintiff, made possible solely by the defendant official's unlawful action, is insufficient to create a justiciable controversy.[13] More is required "than a common concern for obedience to law." [14] There is the related rule [15] that Congress cannot constitutionally enact a statute authorizing a suit to be brought to test out the abstract question of the constitutionality of the statute where there is no actual justiciable controversy.[16]

3. Insisting that that doctrine, substantially as above outlined, is fully applicable here, respondents cite as directly in point the memorandum opinion in City of Atlanta v. Ickes, 308 U.S. 517, 60 S.Ct. 170, 84 L. Ed. 440. There a city, as a substantial coal consumer, brought a suit in a federal district court, to enjoin the Coal Commission from establishing minimum prices by orders, alleged to be invalid, purporting to have been issued pursuant to the Act now before us, and for a declaratory judgment that the Act was unconstitutional. The trial court, holding that it had jurisdiction, dismissed the suit on the merits.[17] On appeal, the Supreme Court affirmed, but not on the merits, holding that the trial court was without jurisdiction. The opinion in its entirety reads as follows: "The judgment is affirmed on the ground that the appellant has no standing to maintain the suit. Tennessee Power Co. v. T. V. A., 306 U.S. 118, [138, 141], 142, 59 S.Ct. 366, 372, 83 L.Ed. 543; Alabama Power Co. v. Ickes, 302 U.S. 464, 478, 479, 58 S.Ct. 300, 303, 82 L.Ed. 374; Sprunt & Son v. United States, 281 U.S. 249, 255, 256, 50 S.Ct. 315, 317, 74 L.Ed. 832; Ætna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 241, 57 S.Ct. 461, 463, 81 L.Ed. 617, 108 A.L.R. 1000." [18]

---

300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000.

[13] Alabama Power Co. v. Ickes, supra; Tennessee El. Power Co. v. T. V. A., supra.

[14] L. Singer & Sons v. Union Pac. R. Co., 311 U.S. 295, 304, 61 S.Ct. 254, 258, 85 L.Ed. 198; Perkins v. Lukens Steel Co., supra.

[15] Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246.

[16] It has been suggested that dismissal of such a suit or proceeding for lack of "standing" is not a dismissal for want of jurisdiction. Cf. Duke Power Co. v. Greenwood County, 4 Cir., 81 F.2d 986, 989, 999. But the lack of such "standing" appears to have been regarded as the equivalent of lack of a justiciable controversy which, in turn, means a lack of constitutional power in the court to hear the case. Such constitutional lack of power would seem clearly to constitute want of jurisdiction. Such was the ruling in Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 480, 43 S.Ct. 597, 67 L.Ed. 1078; cf. Muskrat v. United States, 219 U.S. 346, 363, 31 S.Ct. 250, 55 L.Ed. 246; Rochester Tel. Co. v. United States, 307 U.S. 125, 131, 59 S.Ct. 754, 83 L.Ed. 1147; Ætna Life Ins. Co. v. Haworth, supra, 300 U.S. at page 240, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000.

[17] City of Atlanta v. National Bituminous Coal Comm., D.C.Dist. of Col., 26 F. Supp. 606.

[18] In the Second Annual Report of the Commission for the fiscal year 1938 (p. 21), in referring to the City of Atlanta case then pending in the District Court, it was stated that the Commission had filed a motion to dismiss on the ground that the City had no standing to bring such a suit but "must avail itself of the administrative and judicial remedies" provided in the Act. In the Third Annual Report under the Act, transmitted by respondent Ickes to Congress on January 3, 1940, it is said (p. 27) that, in the Supreme Court, the motion to dismiss had been based on the grounds, *inter alia*, that "there was no equity jurisdiction since the Act itself provided plaintiff with an adequate remedy." Those statements serve to show that respondents were urging that consumers, instead of suing in the District Court, should seek judicial relief under the provisions of the Act, i. e., § 6(b).

It is interesting, in this connection, to note that in the Second Annual Report of the Commission (p. 4) it was stated that "the entire procedure of establishing minimum prices must be so conducted as to afford *any interested* producer or *consumer* an opportunity to present his views, to lay his grievances before the Commission, and, having exhausted other avenues of relief, to *appeal his case to the courts*." (Emphasis added.)

Since, in the City of Atlanta case, the City attacked the constitutionality of the Act, there might have been a question whether § 6(b) was available. We need

There can be little doubt, then, that if this Act made no provisions for review in a Court of Appeals and if (without any statutory provision covering the mode of bringing such actions[19]) petitioner had brought a suit in a district court, setting forth the allegations now contained in its petition, and seeking an injunction or declaratory judgment, the City of Atlanta decision would have been in point, and dismissal of the suit would have been necessary. But the City of Atlanta case was not an action brought in a Court of Appeals under § 6(b) and consequently did not raise the question whether a "person aggrieved" in that section means merely the sort of person who would have "standing to sue" in the absence of a statutory provision thus worded.[20] For light on the effect of such a provision, we must turn to two cases subsequently decided.

4. In those cases, Federal C. C. v. Sanders Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037, and Scripps-Howard Radio, Inc. v. Federal C. C., 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229, it has been held that a "person aggrieved," seeking review under such a statutory provision need not show that he has such a "standing" as is ordinarily required either in injunction suits to restrain action by officials alleged to be unlawful or in declaratory judgment suits brought to determine the validity of such action.[20]

In the Sanders case, the Telegraph-Herald, a newspaper, filed with the Communications Commission an application for a permit to erect a broadcasting station in Dubuque, Iowa. Subsequently, Sanders Bros. Radio Station, which had, for some years, held a broadcasting license for, and had operated a station at, East Dubuque, Illinois, directly across the Mississippi River from Dubuque, applied for a permit to move its station to Dubuque. It then asked leave to intervene in the Telegraph-Herald proceeding. Intervention was permitted by the Commission and both applications were heard in a consolidated hear-

ing. The Commission granted both applications. On Sanders' petition for review in the Court of Appeals, it was held that the Commission's order granting a license to the Telegraph-Herald was invalid because the Commission had failed to make any findings as to whether Sanders would suffer "economic injury" from the resulting competition. On certiorari, the Supreme Court held that the "economic injury" to a rival station is not, in and of itself and apart from consideration of public convenience, interest or necessity, an element which the Commission was obliged to weigh or as to which it must make findings in passing on applications for a broadcasting license. The court said that the Act recognizes that the field of broadcasting is one of free competition, that Congress had not in the Act "abandoned the principle of free competition," that "the broadcasting field is open to anyone," and that the policy of the Act was clearly that "no person is to have anything in the nature of a property right as a result of the granting of a license. * * * Plainly it is not the purpose of the Act to protect a licensee against competition but to protect the public." [309 U.S. 470, 60 S.Ct. 697, 84 L.Ed. 869, 1037.] It said that while the Commission should take into account the question of competition in its bearing upon the ability of the applicant adequately to serve the public, such matters "are distinct from the consideration that, if a license be granted, competition between the licensee and any other existing station may cause economic loss to the latter. If such economic loss were a valid reason for refusing a license this would mean that the Commission's function is to grant a monopoly in the field of broadcasting, a result which the Act itself expressly negatives * * *." Nevertheless, the court went on to say: "It does not follow that, because the licensee of the station cannot resist the grant of a license to another, on the ground that the resulting competition may work economic in-

---

not consider that question which, in any event, is now academic because the constitutionality of the Act has been sustained in Sunshine Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263.

[19] Section 6(d) provides that the jurisdiction of the Courts of Appeal "to set aside, or modify orders of the Commission shall be exclusive."

[20] Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385, 122 A.L.R.

695, has, we think, no bearing here, because, inter alia, as the Supreme Court pointed out, it related to an appeal to the United States Supreme Court, from a state court decision, involving a claim of right and privilege under the Constitution, and did not relate to the "standing" to maintain an original suit in the first instance in a federal court—which is the question before us here.

jury to him, he has no standing to appeal from an order of the Commission granting the application. Section 402(b) of the Act, 47 U.S.C.A. § 402(b), provides for an appeal to the Court of Appeals of the District of Columbia (1) by an applicant for a license or permit, or (2) 'by any other person aggrieved or whose interests are adversely affected by any decision of the Commission granting or refusing any such application.' The petitioner insists that as economic injury to the respondent was not a proper issue before the Commission it is impossible that § 402(b) was intended to give the respondent standing to appeal, since *absence of right implies absence of remedy. This view would deprive subsection (2) of any substantial effect.* Congress had some purpose in enacting section 402(b) (2). It may have been of opinion that one likely to be financially injured by the issue of a license would be the only person having a sufficient interest to bring to the attention of the appellate court errors of law in the action of the Commission in granting the license. It *is within the power of Congress to confer such standing to prosecute an appeal.* We hold, therefore, that the respondent had the requisite standing to appeal and to raise, in the court below, any relevant question of law in respect of the order of the Commission. Compare Interstate Commerce Commission v. Oregon-Washington R. Co., 288 U.S. 14, 23–25, 53 S.Ct. 266, 267, 268, 77 L.Ed. 588." [21] The court then went on to consider alleged defects in the Commission's findings and held that they complied with the statutory requirements as to the public interest.

In the Scripps-Howard case, supra, the same doctrine as to "standing" was reiterated. There the Communications Commission granted, without hearing, the application of WCOL, Inc., a licensee of a broadcasting station in Columbus, Ohio, for a permit allowing it to change its frequency from 1210 to 1200 kilocycles and to increase its power from 100 to 250 watts. Scripps-Howard Radio, Inc., licensee of a station in Cincinnati, Ohio, operating on a frequency of 1200 kilocycles with a power of 250 watts, filed a petition requesting the Commission to vacate its previous order

and set the application of WCOL for hearing. The Commission denied this petition. Scripps-Howard filed a petition for review in the Court of Appeals, and then asked that court to stay the Commission's order pending the disposition of the review action. The six judges of the court, being equally divided on the question of the power to grant a stay, certified it to the Supreme Court which held that the Court of Appeals had that power. The majority opinion said: "The Communications Act of 1934 did not create new private rights. The purpose of the Act was to protect the public interest in communications. By § 402(b) (2), Congress gave the right of appeal to persons 'aggrieved or whose interests are adversely affected' by Commission action. * * * But *these private litigants have standing only as representatives of the public interest.*[22] Federal Communications Commission v. Sanders Radio Station, 309 U.S. 470, 477, 642, 60 S.Ct. 693, 698, 84 L.Ed. 869, 1037. Compare National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 362, 363, 60 S.Ct. 569, 576, 84 L.Ed. 799. That a court is called upon to enforce public rights and not the interests of private property does not diminish its power to protect such rights. 'Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.' Virginian Ry. Co. v. System Federation, 300 U.S. 515, 522, 57 S.Ct. 592, 601, 81 L.Ed. 789. An historic procedure for preserving rights during the pendency of an appeal is no less appropriate—unless Congress has chosen to withdraw it—because the rights to be vindicated are those of the public and not of the private litigants." [316 U.S. 4, 62 S.Ct. 882, 86 L.Ed. 1229.]

The following portion of the minority opinion[23] (which states substantially the argument made by respondents here) further illuminates the position of the majority of the court in the Scripps-Howard case: "Repeated attempts of private litigants to obtain a special stake in public rights have been consistently denied. See Massachusetts v. Mellon, 262 U.S. 447, 43

---

[21] Emphasis added.

[22] Emphasis added.

[23] The writer of this opinion confesses that, before the decision in the Scripps-

Howard case, he had interpreted the Sanders case as it was interpreted in the minority opinion in the Scripps-Howard case.

S.Ct. 597, 67 L.Ed. 1078; Sprunt & Son v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832; Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374; Tennessee Electric Power Co. v. T. V. A., 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543; City of Atlanta v. Ickes, 308 U.S. 517, 60 S.Ct. 170, 84 L.Ed. 440; [L.] Singer & Sons v. Union Pac. R. Co., 311 U.S. 295, 61 S.Ct. 254, 85 L.Ed. 198. The attempt to obtain a stay is but another manifestation, albeit oblique, of that same endeavor. * * * For that reason alone § 402(b) should be read narrowly and restrictively. But it is said that Congress entrusted the vindication of the public interest to private litigants. The Sanders case properly construed merely means that the Court of Appeals has jurisdiction of appeals by a 'person aggrieved' or by one 'whose interests are adversely affected' by the Commission's decision. § 402(b). But that does not mean that an appellant has a cause of action merely because he has a competing station. Unless he can show that his individual interest has been unlawfully invaded, there is merely damnum absque injuria and no cause of action on the merits. Alabama Power Co. v. Ickes, supra; Greenwood County v. Duke Power Co., 4 Cir., 81 F.2d 986, 999. And see Duke Power Co. v. Greenwood County, 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381. Congress could have said that the holder of a radio license has an individual substantive right to be free of competition resulting from the issuance of another license and causing injury. In that event, unlike the situation in Muskrat v. United States, supra, there would be a cause of action for invasion of a substantive right. But as we said in the Sanders case Congress did not create such a substantive right. And no facts are shown here which would bring this appeal outside the rule of that case. On that assumption I fail to see how an appeal statute constitutionally could authorize a person who shows no case or controversy to call on the courts to review an order of the Commission."

■ 5. With the majority opinion illuminated by that dissent, we believe that

the usual "standing to sue" cases can be reconciled with the Sanders and Scripps-Howard cases,[24] as follows: While Congress can constitutionally authorize no one, in the absence of an actual justiciable controversy, to bring a suit for the judicial determination either of the constitutionality of a statute or the scope of powers conferred by a statute upon government officers, it can constitutionally authorize one of its own officials, such as the Attorney General, to bring a proceeding to prevent another official from acting in violation of his statutory powers; for then an actual controversy exists, and the Attorney General can properly be vested with authority, in such a controversy, to vindicate the interest of the public or the government. Instead of designating the Attorney General, or some other public officer, to bring such proceedings, Congress can constitutionally enact a statute[25] conferring on any non-official person, or on a designated group of non-official persons, authority to bring a suit to prevent action by an officer in violation of his statutory powers; for then, in like manner, there is an actual controversy, and there is nothing constitutionally prohibiting Congress from empowering any person, official or not, to institute a proceeding involving such a controversy, even if the sole purpose is to vindicate the public interest. Such persons, so authorized, are, so to speak, private Attorney Generals.

Thus recently, the Supreme Court in United States ex rel. Marcus v. Hess, 63 S.Ct. 379, 383, 87 L.Ed. ——, affirmed a judgment in favor of a citizen under the so-called Federal Informers Act; that Act[26] authorized a *qui tam* action by "any person," in behalf of the government, to institute and prosecute to judgment a suit to recover the fines and double damages due to the United States by one who obtains money from it by fraudulent claims, one-half of the recovery being paid to the person who institutes the suit and the other half to the government. The court said, "Qui tam suits have been frequently permitted by legislative action * * *. Congress has power to choose this method to protect the government from burdens fraud-

---

[24] See L. Singer & Sons v. Union P. R. Co., 311 U.S. 295, 307, 308, 61 S. Ct. 254, 85 L.Ed. 198; Rochester Tel. Corp. v. United States, 307 U.S. 125, 131–134, 59 S.Ct. 754, 83 L.Ed. 1147; Coleman v. Miller, 307 U.S. 433, 460, 467, 59 S.Ct. 972, 83 L.Ed. 1385, 122 A.L.R.

695; Advisory Opinions, 1 Encyc. Soc. Sc. 475.

[25] That the Declaratory Judgment Act is not such a statute is clear from the decision in City of Atlanta v. Ickes, supra.

[26] 31 U.S.C.A. §§ 231–234.

ulently imposed upon it \* \* \*. 'Statutes providing for actions by a common informer, *who himself had no interest whatever in the controversy other than that given by statute,* have been in existence for hundreds of years in England, and in this country ever since the foundation of our government,' Marvin v. Trout, 199 U. S. 212, 225, 26 S.Ct. 31, 34, 50 L.Ed. 157."[27]

The court, in the Sanders and Scripps-Howard cases, as we understand them, construed the "person aggrieved" review provision as a constitutionally valid statute authorizing a class of "persons aggrieved" to bring suit in a Court of Appeals to prevent alleged unlawful official action in order to vindicate the public interest, although no personal substantive interest of such persons had been or would be invaded.[28] Although one threatened with financial loss through increased competition resulting from unlawful action of an official cannot, solely on that account, make the proper showing to maintain a suit against the official, absent such a statute, yet the "person aggrieved" statute gives the needed authority to do so to one who comes within that description. True, in the Sanders and Scripps-Howard cases, the review provisions of the statute referred not only, as here, to a "person aggrieved" but also to a "person adversely affected" by the administrative order; we think, however, that the omission of the latter clause in § 6(b) of the Act before us makes no significant difference. If, then, one is a "person aggrieved," he has authority by review proceedings under § 6 (b), to vindicate the public interest involved in a violation of the Act by respondents, even if he can show no past or threatened invasion of any private legally protected substantive interest of his own.

6. Of course, not every person is a "person aggrieved." But the Supreme Court has explicitly told us that one threatened with financial loss through increased competition resulting from a Commission's order is "aggrieved," and entitled as such to a review notwithstanding that the very statute pursuant to which he obtains review is designed to keep competition alive and confers upon him no property right which gives him any kind of immunity from competition. It would seem clear, then, that a consumer threatened with financial loss by a Commission's order, which fixes prices and prevents competition among those from whom the consumer purchases, is also a "person aggrieved." Indeed there is more reason why Congress should be deemed to have intended to confer such a power on consumers than to authorize a holder of a radio station license to obtain review of an administrative order, issued under the Communication Act, subjecting him to increased competition. For the common law has always zealously regarded competition as inherently desirable.[29] And Congress has usually reinforced that policy legislatively, as manifested in the Anti-Trust laws, except in unusual circumstances, such as those which induced the passage of the Act here before us;[30] since such a statute is patently an exception, it should surely be construed, if possible, in such a way as not to blot out all protection to consumers. As respondents themselves freely acknowledge in their briefs, several sections of the Act show that Congress (recognizing that this legislation was granting immunity to coal producers from the provisions of the Anti-Trust laws) was bent on giving adequate off-setting protection to consumers.[31] Thus

[27] Emphasis added.

[28] Cf. I. C. C. v. Oregon-Wash. R. Co., 288 U.S. 14, 26, 53 S.Ct. 266, 268, 77 L. Ed. 588 (cited and relied on in the Sanders case, supra) where, in construing a statute authorizing an "appeal to the Supreme Court \* \* \* by an aggrieved party," the court said, "The section can be given effect only by holding that an aggrieved party may challenge the decree not only to vindicate his own rights, but those of the United States as well."

[29] For a discussion, pro and con, of the wisdom of that tradition, see Brandeis, J., in New State Ice Co. v. Liebman, 285 U.S. 262, 280, 306–310, 52 S.Ct. 371, 76 L.Ed. 747; cf. Holmes, Collected Legal Papers (1921) 121, to the effect that the common law tradition is based on the "economic postulate that free competition is worth more to society than it costs."

[30] See Sunshine Coal Co. v. Adkins, 310 U.S. 381, 394–396, 60 S.Ct. 907, 84 L.Ed. 1263, as to the deplorable conditions which led to its enactment; cf. Rostow, Bituminous Coal and the Public Interest, 50 Yale L.J. 543; Hamilton, Coal and the Economy, A Demurrer, 50 Yale L.J. 595, and Rostow, Joinder in Demurrer, 50 Yale L.J. 613.

[31] For another typical instance of Congressional concern for consumers, see the Public Utility Holding Company Act, 15 U.S.C.A. § 79a et seq.; see, e. g., § 79f (b).

§ 4 II (a)[32] provides that minimum prices proposed as a basis for co-ordination "shall have due regard to the interests of the consuming public," and § 4 II (c) refers to protection of "the consumer of coal against unreasonably high prices therefor."[33]

7. The Act imposes heavy penalties for violation of Commission orders on persons from whom consumers purchase coal. Relief has often been granted against enforcement of statutes in suits by persons not themselves subject to such statutory penalties; to be sure, in each such case, the complainant was able to show the threatened invasion of personal substantive interest;[34] but here, as we have seen, a consumer is not obliged, under § 6(b), to make such a showing, and therefore it cannot be argued that petitioner is precluded from court review merely because the statute does not operate directly upon consumers; in the Sanders and in the Scripps-Howard case, review was accorded to a competitor, as a "person aggrieved," although the order complained of was not directed against him, it being held sufficient that he would suffer financially as a result of the order.[35]

8. Respondents argue that it has been held that consumers have not a sufficient interest to justify their intervening in court suits to restrain rate orders issued by a State Commission,[36] and therefore should not be deemed persons "aggrieved" under § 6(b). But those decisions, even assuming that they are otherwise in point, were made in cases where there was no statute, such as we have here, authorizing suit by any "person aggrieved." Absent such a statute, there have been, as above noted, similar decisions as to suits by competitors, but those decisions were given no weight in the Sanders and Scripps-Howard cases where there was such a statute.

Moreover, the cases dealing with interventions by consumers in suits attacking state commission rate orders are unlike the case at bar. For instance, in City of New York v. New York Tel. Co., 261 U.S. 312, 316, 43 S.Ct. 372, 67 L.Ed. 673, a state commission had made orders reducing telephone rates in the New York City area and the telephone company brought suit to enjoin those orders, making the commission and the State Attorney General parties defendants. The City moved to be made a party defendant in those suits, in order to assist in defending the Commission's orders; the trial court denied the motion; the Supreme Court held that it was within the discretion of the trial court to refuse to allow the City to become a defendant, since its interest and those of its residents were adequately represented by the State Commission and the Attorney General.[37] In such a case, the public officials are in court defending an order benefiting consumers by reducing rates, and the consumers are not complaining that the order adversely affects them but, on the contrary, want to help to persuade the court to sustain the order; in such circumstances, it is easy to see why the Supreme Court has held that it is within the discretion of the trial court to deny intervention to consumers. But here the petitioner, on behalf of consumers, complains that the respondents' orders adversely affect consumers and no official is assailing those orders on their behalf; if respondents' motion were granted, there could, on those facts, never be any court proceeding in

---

[32] Referred to in Sunshine Coal Co. v. Adkins, 310 U.S. 381, 397, 60 S.Ct. 907, 84 L.Ed. 1263.

[33] See also § 15 referring to "coal prices" which "are excessive, and oppressive of consumers."

[34] See, e. g., Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A. 1916D, 545, Ann.Cas.1917B, 283; Pierce v. Society of Sisters, 268 U.S. 510, 45 S. Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468.

[35] As a consequence, there is no force to the following contention made by respondents: "The fact that a code member is required under the Act to preserve an established price level, in its transactions with consumers, no more invades the legal rights of such consumers than if the code member, in the absence of statutory regulation, voluntarily increases prices to the same level."

Moreover, that argument ignores the fact that, were it not for valid orders issued pursuant to this statute, the code members, if they raised their prices by agreement among themselves, might be subject to the penalties of the Anti-Trust laws.

[36] City of New York v. New York Tel. Co., 261 U.S. 312, 316, 43 S.Ct. 372, 67 L.Ed. 673; Smith v. Illinois Bell Tel. Co., 270 U.S. 587, 592, 46 S.Ct. 408, 70 L.Ed. 747; cf. In re Engelhard & Sons Co., 231 U.S. 646, 651, 34 S.Ct. 258, 58 L.Ed. 416.

[37] The Smith and Engelhard cases, supra, are of a similar character.

which any consumers could be heard to complain of the orders. The situation here would be analogous to that in the cases cited, if Consumers' Counsel had brought review proceedings, and if petitioner or other representative of consumers then sought to intervene; conceivably (although we do not here decide the question) in such a case we would have discretion to permit or deny such intervention.[38]

9. Respondents contend that Congress could not have intended to construe § 6(b) to include consumers, because such an interpretation will open up the "possibilities of separate law suits by hundreds of thousands of individual consumers" attacking Commission orders, with the result of impairing the effective administration of a statute designed for the stabilization of the coal industry. But there are no such horrendous possibilities. A review proceeding under § 6(b) must be brought within sixty days after the entry of the Commission's order and only in one of the eleven Circuit Courts of Appeal; a decision in one such action in any one of those courts would ordinarily be, at least, stare decisis in that same court. Moreover, § 6(b) contains a provision to the effect that, upon the filing in a Court of Appeals of a petition for review and of the transcript of the administrative proceeding, "such court shall have exclusive jurisdiction to affirm, modify, and enforce or set aside such order, in whole or in part." That language, in other statutes, has been construed to mean that where a petition to review an order has been filed by any aggrieved person in any one Court of Appeals, no other Court of Appeals will entertain a review petition with respect to that same order subsequently filed by another aggrieved person.[39] And if, despite those rulings, there should be differences in decisions between the several Courts of Appeal, such differences will usually soon be composed because, ordinarily, they will induce the Supreme Court to grant certiorari.

[38] Wright v. Central Ky. Gas Co., 297 U.S. 537, 56 S.Ct. 578, 580, 80 L.Ed. 850, cited by respondents, did not relate to the "standing to sue" of consumers. There a utility company, by a contract with a city, purchased a franchise for the distribution and sale of gas to consumers in that city. The contract provided that the company should promulgate rates and that, if the city deemed them to be excessive, proceedings should be instituted before the state commission in order to have reasonable rates prescribed; the contract also provided that, pending proceedings before the Commission and any subsequent court proceedings, the company should have the right to charge specified temporary rates but with a proviso that a certain amount collected under such rates should be impounded pending the final rate determinations and should be distributed under the order of the Commission or of the court to the company or its customers. The company promulgated a rate schedule, the city objected, and there were Commission proceedings resulting in an order prescribing rates. The company brought suit attacking these rates; the court denied injunction and directed distribution of the impounded fund; this decree was reversed by the Supreme Court. The City and the company then entered into a compromise contract agreeing upon a rate for the future and providing for distribution of the impounded fund. The company then brought suit in the state court for a declaratory judgment as to the rights of the company. Another suit was filed by a gas consumer seeking an injunction directing the company to furnish him gas at a specified rate; the two cases were consolidated, and later other consumers were permitted to file an intervening petition in the company's suit against the City. The state court upheld the compromise contract against the objections of the consumer parties who contended that they were being deprived of vested property rights in the impounded funds. On appeal to the United States Supreme Court, the state court judgment was affirmed. The court said that the appellate consumers had no vested right which precluded the City from effecting a reasonable adjustment of the controversy. In that connection it said: "In making that settlement, as well as in the making of the original franchise contract, the consumers were represented by the city." It is plain that this remark related to the alleged substantive rights of the consumers and had nothing to do with their "standing to sue." They were permitted to sue; the decision of the Supreme Court was on the merits and did not consist of a dismissal for want of jurisdiction.

[39] L. J. Marquis & Co. et al. v. S. E. C., 2 Cir., 134 F.2d 335, memorandum opinion, dated December 23, 1942; Okin v. S. E. C., 2 Cir., 134 F.2d 333, memorandum opinion, dated December 10, 1942; N. L. R. B. v. Friedman-Harry Marks Clothing Co., 2 Cir., 83 F.2d 731; Hicks v. N. L. R. B., 4 Cir., 100 F.2d 804; cf. Stanolind Oil & Gas Co. v. N. L. R. B., 5 Cir., 116 F.2d 274; Standard Oil Co. v. N. L. R. B., 8 Cir., 114 F.2d 743.

**10.** Respondents · assert that petitioner has waived its right, if any, to proceed under the legal theory on which the petitions to review were ·sustained in the Sanders and Scripps-Howard cases, because petitioner, in its original brief, stated that "it does not attempt to assert any general public right to review the provisions of the orders insofar as they may affect other market areas and consumers other than petitioners' members." The short answer is that petitioner, in its reply brief, argued at length that the Sanders case sustains its standing to maintain this review action. Moreover, the language used in petitioner's original brief cannot, we think, be given the interpretation ascribed to it by respondents. And even if it could, it would, at most, constitute a mistaken concession, not as to any facts, but merely as to a legal argument which we may and do ignore in a motion directed solely to the question of this court's jurisdiction, since, as a matter of "law," the petition and the undisputed facts show that petitioner has a "standing", under the statute, to vindicate the public interest.[40]

**11.** Respondents seek to distinguish the Sanders and Scripps-Howard cases by an argument to which we have already briefly adverted and which, stated more in detail, runs as follows:

(a) Section 2(b) of the Act[41] provides for the appointment of a public officer, the Bituminous Coal Consumers' Counsel who, to quote that section, is to "appear in the interest of the consuming public in any proceeding before the Commission." (b) Although there is no specific provision giving Consumers' Counsel the authority to seek review of a Commission's order under § 6(b), yet, respondents assert, he clearly has such authority. This authority derives, say respondents, not at all from the fact that Consumers' Counsel was a party to the Commission proceedings; such a position respondents shun, for it would · compel the conclusion that petitioner, as also a party to those administrative proceedings, would also be entitled to a review.

Respondents find the sole basis of the authority of Consumers' Counsel to seek review under § 6(b) in the fact that, being designated by § 2(b) to represent the Consumers' interest in "any proceeding before the Commission," he is necessarily, by clear implication, say respondents, a "person aggrieved," for purposes of court review within the meaning of § 6(b). (c) Although, then, according to respondents, the mere fact of representation of consumers' interests before the Commission necessarily, by clear implication, constitutes Consumers' Counsel a "person aggrieved," and therefore one entitled to court review, ·yet petitioner, although it also represented many consumers before the Commission, may not seek review as, similarly 'by implication, a "person aggrieved," because, say respondents, Consumers' Counsel has the exclusive authority, under § 6(b), to represent all consumers in court. (d) Where, then, as here, the Consumers' · Counsel has not seen fit to seek court review, respondents maintain that no consumer can have a day in court.[42]

In the light of the obvious Congressional intent to protect the consumers' interests under this Act, we can well understand respondents' eagerness to show that someone—Consumers' Counsel—can seek court review on behalf of consumers. But, although respondents are represented here by unusually able lawyers, they advance an awkward argument for shutting out of court every actual consumer (and all representatives selected by actual consumers) and for confining efforts to obtain court relief for consumers to such activities as the official Consumers' Counsel, in his sole and unregulated discretion, may choose to undertake. For respondents' argument includes an admission—more, a contention—that it is merely the representation by Consumers' Counsel of the consumers' interests which, by implication, makes him a "person aggrieved." Consequently, if the Act does not constitute him the exclusive consumers' representative, respondent's own argument leaves no escape from the conclusion that

---

[40] The situation is not like that which confronted us in Cover v. ·Schwartz, 133 F.2d 541, where a patentee, on his appeal in· this court from a judgment adverse to him, advised us that he was satisfied from thé facts brought out on the trial in the lower· court that appellee had not infringed his patent, and therefore abandoned the infringement issue, so that it ·

appeared *factually* that there was no justiciable controversy before us.

[41] See also § 22.

[42] Not even States and Cities which, under §§ 4 II (d) and 4 II (j), are "governmental consumers" of a kind that, as respondents admit, Consumers' Counsel does not represent in proceedings "before the Commission."

anyone possessing or representing a consumer's interest, is a "person aggrieved," and, accordingly, if he was a party to the Commission proceedings, entitled to seek court review. Respondents' argument, then, is bottomed entirely on their assertion that Consumers' Counsel is the sole representative of consumers. The Act admittedly nowhere so provides, so that the alleged exclusive nature of that representation rests, as we have seen, on implication. If, however, there is such an implication of such exclusive representation, it should be peculiarly applicable to a "proceeding before the Commission," since it is as to such proceedings, and those alone, that the Act —2(b)—explicitly provides for representation by Consumers' Counsel of "the interest of the consuming public." Yet the Commission has itself administratively interpreted the act to mean that the Consumers' Counsel·is not the exclusive representative even of private consumers, in a "proceeding before the Commission"; for the Commission, as above noted, permitted the petitioner, as a representative of such consumers, to become a party to the proceedings before it. This permission was granted pursuant to Commission practice rules,[43] authorized by the provisions of § 2(a) which provides, *"No order which is subject to judicial review under section 6* [section 836] * * * shall be made * * * by the Commission, unless * * * it has afforded to *interested parties* an opportunity to be heard. * * *"* [44] The Commission, by allowing petitioner to become a party, must be deemed to have found that petitioner came within the class of "interested parties." One of the respondents, as Director of the Division, in the proceedings below referred to contentions made by "two representatives of consumer interests, namely, Bituminous Coal Consumers' Counsel and Associated Industries of New York" (the petitioner here).[45] In the Monograph of the Attorney General's Committee on Administrative Procedure relating to the administration of this Act,[46] it is said, in referring to the hearings in General Docket 15 (which began May 15, 1938): "A vigorous dispute with Consumers' Counsel, who took the position that individual consumers could appear as such through their own representatives and were not limited to representation by his office, was settled for all practical purposes when the Commission decided as a matter of policy to permit such appearances; the legal question is still open." That the question is no longer open so far as respondents could close it, appears from the following: Before the Committee on Ways and Means of the House which, in 1941, was considering the extension of the Act for a two-year period, the then Director, asked whether "many consumers or their representatives" had appeared before the Commission, replied: "A great many appeared, and associations appeared, such as, for instance, the Associated Industries of New York, who have a great many members, and they are very active."[47] In the Second Annual Report of the Commission (covering the fiscal year 1938 and additional activities to November 15, 1938),

---

[43] Under the heading of "Parties" the Rules of Practice state: "The parties to proceedings before the Commission are classified as complainants, applicants, consumers' counsel, petitioners, defendants, intervenors, protestants and respondents, according to the nature of the proceedings and their relation thereto." Under the heading of "Protestants," the rules provide: "Persons other than the consumers' counsel objecting on the ground of personal or public interest to any action which the Commission is authorized to take under proceedings before it, are styled 'protestants.'" Other sections of the Rules provide: "Protestants must set forth the position and interest of the protestant in the proceeding * * * Anyone entitled under the Act to complain to the Commission and having an interest in any pending procedure may petition to intervene therein * * * and such petition may be granted in the dis-

cretion of the Commission * * * Petitions for intervention must set forth * * * the position and interest of the petitioner in the proceeding * * * If leave is granted, the petitioner thereby becomes an intervenor and a party to the proceeding * * * None other than a party who has become such in conformity with these rules will be heard * * * Notice shall be served upon all parties to the proceeding, including the consumers' counsel, state or other governmental authorities having official interest in the proceedings, and such other persons as may be deemed to have a substantial interest therein."

[44] Emphasis added.

[45] See also the other facts summarized at the beginning of this opinion.

[46] 77th Cong., 1st Sess., Sen. Doc. No. 10, Pt. 10, page 12.

[47] Printed Hearings, p. 603.

in referring to enforcement of regulations, it was said (p. 4): "On the other hand, it is clear that such powers of enforcement must be accompanied by safeguards that will protect the rights of individual producers and the interests of the consuming public. This means that the entire procedure· of establishing minimum prices must be so conducted as to *afford any interested* producer or *consumer an opportunity to lay his grievances before the Commission* * * *" [48]

Accordingly, respondents, by their own administrative interpretation, have held that the Act does not, by implication, vest in the Consumers' Counsel the sole authority to represent all consumers in· a "proceeding before the Commission," [49] which will lead to an "order which is subject to judicial review under § 6 [section 836]" [50] —i. e., subject to court review on petition of "any person aggrieved by an order issued by the Commission in a proceeding to which such person is a party." [51] And we see no good reason (nor do respondents suggest any) for reading such· an implication into § 6(b) while, at the same time, refusing to read it into § 2(a). The phrase "person aggrieved" no more calls for such

an implied interpretation than does the phrase "interested persons." To put it differently, if petitioner is, as the Commission in· effect found, included in the category of "interested persons," it is difficult to perceive why petitioner is not a "person aggrieved." [52]

We have been told ·that we must accord very great weight to administrative interpretations by these respondents of the provisions of this very Act. Gray v. Powell, 314 U.S. 402, 411-413, 62 S.Ct. 326, 86· L.Ed. 301. We might reject such an administrative interpretation if it were plainly contradicted by explicit statutory provisions or utterly inconsistent with the demonstrated intention of Congress manifested in the legislative history of the Act. Cf. the Estate of Sanford v. Commissioner, 308 U.S. 39, 52, 60 S.Ct. 51, 84 L.Ed. 20; United States v. City and County of San Francisco, 310 U.S. 16, 31, 32, 60 S.Ct. 749, 84 L.Ed. 1050. But that is not this case.[53] Here we have a "contemporaneous construction of a statute by the men charged with responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new."

---

[48] The sentence continued: "and, having exhausted other avenues of relief, to appeal his· case to the courts." We give no weight to that particular part .of the statement since the interpretation of the Act with reference to court action is not within the scope of administrative interpretation. It is, however, of interest. See footnote 17, supra.

[49] § 2(b).

[50] § 2(a).

[51] § 6(b).

[52] Respondents' arguments would lead to a curious result. They say that Consumers' Counsel did not raise the legal objections in the proceedings below which petitioner did there raise and reiterates here; and they indicate that, if Consumers' Counsel had sought review, he could not have raised those objections. If that argument were sound (a matter we do not decide) it would mean that, if the Consumers' Counsel exclusively represented consumers in court, the consumers would never have a day in court to urge what may be solid objections to the invalidity of the orders, since, although other consumers' representatives were permitted to and did voice those objections in the administrative proceedings, they could not be asserted in a court review because not

urged. by Consumers' Counsel in the administrative proceedings.

[53] Respondents refer to a statement made by a witness in the House Committee hearing that he understood the statute to mean that a consumer could not, as of right, *institute* a complaint before the Commission against the price of coal, and that a municipality alone could petition the Commission "on behalf of the consumers"; and respondents intimate that one Congressman, a member of the Committee, agreed with that statement. Such data, at best, is not the kind of legislative history which is persuasive in construing the statute.

Respondents also refer to the House Committee Report recommending the reestablishment of Consumers' Counsel as an independent agency in which it was said that the purpose was that "of insuring an alert and vigorous representation *with consumers* throughout the country, large and small alike * * *" House Report 3240, H.R. 4146, 77th Cong., 1 Sess. (1941) p. 8; emphasis added. This language is far from indicating an intention to make Consumers' Counsel the sole spokesman for private consumers. On the contrary, it is far more consistent with the position taken by Consumers' Counsel noted infra that he was not their sole spokesman even before the Commission.

United States v. American Trucking Association, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345. Since it is in no sense unreasonable, we must accept respondents' interpretation of "interested persons" in § 2(a). Cf. Morgan Stanley & Co. v. Securities Exchange Comm., 2 Cir., 126 F. 2d 325. It is true, as respondents contend, that the interpretation of § 6(b)—the court review section—is not within the scope of the Commission's administrative powers and that their interpretation of that section need not concern us. But, if we accept, as we must, the Commission's interpretation of § 2(a) and 2(b)—which are within that administrative scope—as giving to Consumers' Counsel no exclusive authority to represent all consumers in proceedings before the Commission, we cannot consistently interpret § 6(b) so as to give him such an exclusive authority for purposes of court review.

Respondents point to a provision in the Act [54] specifically conferring the right to what respondents call "administrative remedies" before the Commission upon "any State or political subdivision of a State." Respondents say that such governmental agencies in their capacity as "governmental consumers" have a statutory right to those remedies, whereas governmental "non consumers", since they are not specifically mentioned in the Act, have no "legal right" even to those "administrative remedies" and, a fortiori, no right to relief in court.[55] But, as above noted under § 2(a), the Commission must grant a hearing in its own reviewable proceedings to "interested persons," and, as respondents and Consumers' Counsel have construed that provision, it is not limited to "govern-

mental" consumers, but includes also "non-governmental" consumers and their representatives—such as petitioner. We regard that construction as not at all unreasonable and therefore one which we must accept.

Summarizing respondents' position, in effect they are saying: "In our own proceedings, when they were of such a nature as to be reviewable by the courts, we have construed the Act to mean that Consumers' Counsel—who has no express statutory authority to appear for consumers except in proceedings before us—is not the only representative of private 'non-governmental' consumers, but that, notwithstanding Consumers' Counsel's appearance in such proceedings, petitioner could also participate as a party representing private consumers, being an 'interested person' under § 2(a). Nevertheless, we now ask the court to construe § 6(b), relating to court actions, to mean that Consumers' Counsel —who is not mentioned in § 6(b)—is the sole representative in court of all consumers and, accordingly, to hold that petitioner must be excluded from appearing in court for any consumers." We believe that to be an untenable position.

In the Chicago Junction case, 264 U.S. 258, 267, 44 S.Ct. 317, 320, 68 L.Ed. 667, certain railroads had been permitted by the Interstate Commerce Commission to become parties to a proceeding before it. They then brought suit to set aside the resultant Commission order. The applicable statute (now Title 28 U.S.C.A. § 45a) provided that *"any party * * * in interest to the proceeding before the commission"* terminating in a Commission order, may *"intervene"*[56] in "any suit wherein is involved the validity of such" order. The

---

[54] §§ 4 II(d) and 4 II(j).

[55] As noted above, respondents insist that City of Atlanta v. Ickes, supra—which held that a city as a consumer has no "standing" to maintain a suit against respondents in the District Court—is completely applicable to court review under § 6(b). This compels respondents to argue, as they do, that cities and states, although admittedly authorized by specific provisions of the Act to protect their consumer interests by appearing as parties in a Commission proceeding, are precluded from obtaining court review under § 6(b), because, say respondents, the representation of consumer interests in court is vested by the Act solely in consumers' counsel. The awkwardness of respondents' position thus becomes even more clear: The only basis for their contention

that Consumers' Counsel has such exclusive authority in court is the fact that, under § 2(b), he is to appear for the "consuming public" in all proceedings "before the Commission"; if his authority to represent consumers in court derives solely from his authority to represent consumers "before the Commission," then it is impossible to see why states and cities, also specifically authorized to represent themselves as consumers before the Commission, have not a similar authority to represent themselves in court under § 6(b). But, if they do have that authority, then (aside from reasons already canvassed) it follows that City of Atlanta v. Ickes has no bearing on a review proceeding under § 6(b).

[56] Emphasis added.

Supreme Court held that the fact that permission had been given by the Commission to the plaintiff railroads to become parties to the administrative proceedings gave them the right not merely to *"intervene"* in a court suit brought by someone else but also themselves to *institute* such a suit. The court said that that permission by the Commission "implies a finding by the Commission that the plaintiffs have an interest," because leave to become parties "can be granted" by the Commission "only to one showing interest." When, however, the question again arose in Sprunt & Sons v. United States, 281 U.S. 249, 255, 50 S.Ct. 315, 74 L.Ed. 832, and Pittsburg & W. Va. Ry. Co. v. United States, 281 U.S. 479, 486, 488, 50 S.Ct. 378, 74 L.Ed. 980, the court held that the statute, which it now construed as referring merely to *intervention* in a court suit, did not mean that a person permitted to become a party to the Commission proceeding could maintain "an *independent suit*" in court, assailing the Commission's order. But the Supreme Court clearly indicated that, if the plaintiffs had sought merely to "intervene" in a court suit instituted by another and proper person, the ruling would have been otherwise. In the later case of I. C. C. v. Oregon-Wash. R. & N. Co., 288 U. S. 14, 53 S.Ct. 266, 77 L.Ed. 588, persons who had been permitted to become parties to the Commission proceedings did not institute but "intervened" in a court suit involving the Commission's order; the Supreme Court held that they were entitled to appeal from the decision of the trial court under a section of the same statute which authorized an appeal to the Supreme Court by "an aggrieved party." The instant case resembles the Oregon-Washington case and not the Sprunt and Pittsburg & W. Va. cases for here, under § 6(b), a party to the administrative proceeding, if "aggrieved," is entitled himself to institute a review action and is not limited to "intervention" in such an action brought by someone else.[57]

Provisions in some of the many statutes, relating to administrative agencies, permit court review by a "person aggrieved"[58] and do not also require, as does § 6(b) here,[59] that he must have been a party to the administrative proceeding. The plain purpose of that additional requirement in § 6(b) here is to preclude review by one who, although "aggrieved", has not first presented objections to the Commission; we think its purpose is not, as respondents suggest, to set up two different tests—one for the interest needed to become a party to the administrative proceeding and another for the interest needed to obtain court review.

We are not, however, to be taken as saying that there might not be a case where, by a blunder, the Commission had permitted a person to become a party to its own proceeding who, as the record facts showed, was unquestionably not an "interested person"; in such event it might be true that such a person could not be treated as a "person aggrieved" under § 6(b). But that question is not now before us.

 12. It is urged by respondents that, even if a consumer is a "person aggrieved," nevertheless the petition should be dismissed because there is nothing in the record below, and only a bare allegation in the petition here, showing that petitioner is itself a consumer. But petitioner is a membership corporation "formed for the promotion of the welfare of its members"; and respondents concede in their brief that, for the purpose of this motion, petitioner's membership consists of 1,356 persons, firms and corporations, including many who "purchase and consume substantial quantities (estimated at 15,-000,000 tons for the year 1942) of bituminous coal produced in Minimum Price

[57] In Alton R. Co. v. United States, 315 U.S. 15, 19, 62 S.Ct. 432, 435, 86 L.Ed. 586, the applicable statute provided that suit to enjoin certain acts authorized by the I. C. C. might, in the first instance, be brought by "any party in interest." The court held that, on the facts, the complainant there came within the "party in interest" provision, saying: "We do not stop to inquire what effect, if any, the status of appellant railroad companies as intervenors before the Commission had on their right to bring and maintain this suit. Cf. Chicago Junction case, 264 U. S. 258, 44 S.Ct. 317, 68 L.Ed. 667, with Pittsburg & West V. Ry. Co. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L. Ed. 980".

[58] See, e. g., as to the S. E. C., Title 15 U.S.C.A. § 79x; as to the F. C. C., Title 47 U.S.C.A. § 402(b) (2).

[59] For a statute relating to the S. E. C., which, like § 6(b) here, provides that the "aggrieved" person must have been a party to the Commission's proceedings, see Title 15 U.S.C.A. § 78y.

Area 1 * * * and which is shipped for sale and sold in Market Areas 2 and 4";[60] and (again for purposes of this motion) respondents concede that those members may well be affected by the respondents' orders which increase the minimum prices at which coal can be sold by code member producers in an area in which those of petitioner's members who are coal purchasers transact their business. Respondents, as already noted, permitted petitioner to become a party to proceedings before them on the basis that petitioner did represent consumers, and with evidence in the record of petitioner's membership; and respondents, in those proceedings referred to petitioner as a representative of consumers. We take that as an administrative finding by respondents that petitioner is vested with sufficient authority to represent its consumer members. Consequently, we do not regard as in point cases [61] suggesting that, ordinarily, there may be doubt whether a membership organization can be permitted to sue on behalf of its members, absent specific authority to do so.

13. In Saxton Coal Mining Co. v. National Bituminous Coal Commission, 68 App.D.C. 245, 96 F.2d 517, 518, the court, although acting only pendente lite, reached a conclusion similar to ours. There consumers filed a petition under § 6(b) to review price-fixing orders of the Commission, made in 1938 (and not in issue here), alleged to be invalid because, inter alia, it was charged that they were made without findings of fact. Pending a hearing on the merits, the court stayed the Commission's orders.[62] While the report of the case does not so show, respondents admit that on a separate petition, under § 6(b), filed by the then Consumers' Counsel and by petitioner here and some of its members, the court granted a similar stay enjoining the Commission from enforcing its orders "in so far as they fix or establish minimum prices for coals of code members for sale to said members of Associated Industries of New York State, Inc."[63] Since the order of the court was not on the merits, it cannot be said to be res judicata. However, we note the case because it is persuasive here as to petitioner's "standing".

14. Of course, nothing we have said in this opinion is to be taken as indicating in any way that, when we consider this case on the merits, we will find any invalidity in respondents' orders; and of course, too, our review will be limited to ascertaining whether respondents have committed any errors of "law," and will be very narrow in scope.[64]

The motion is denied.

[60] New York State is in Market Areas 2 and 4.

[61] Moffat Tunnel League v. United States, 289 U.S. 113, 119, 53 S.Ct. 543, 77 L.Ed. 1069; In re Engelhard & Sons Co., 231 U.S. 646, 651, 34 S.Ct. 258, 58 L.Ed. 416.

But see A. F. of L. v. N. L. R. B., 70 App.D.C. 62, 103 F.2d 933, affirmed, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347.

[62] The court said: "Without prejudice to an ultimate ruling on the subject, we think it cannot be said at this stage of the proceedings that the consumer railroads are so clearly not aggrieved persons within the Act as to have no statutory foundation for judicial review and as thus not to be entitled to pendente lite relief."

[63] Counsel for the respondents advises us that the respondents as successors of the Commission subsequently rescinded the orders under review and the court then dismissed the petitions.

[64] Cf. Gray v. Powell, supra; Sperry Gyroscope Co. v. N. L. R. B., 2 Cir., 129 F.2d 922, 942; Morgan Stanley & Co. v. Securities Exchange Comm., 2 Cir., 126 F.2d 325, 332, 333; Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 220–223, aff'd Endicott Johnson Corp. v. Perkins, 63 S.Ct. 339, 87 L.Ed. ——, January 11, 1943.