**W. R. GRACE & CO. v. CIVIL AERONAU-TICS BOARD et al.**

No. 92.

Circuit Court of Appeals, Second Circuit.

Jan. 28, 1946.

Rehearing Denied Feb. 21, 1946.

In the opinion filed by the Board on May 24, 1944 in the present proceeding, it stated the following facts:

"Pan American Airways, Inc., a wholly-owned subsidiary of Pan American, has operated international air transportation services since 1927. Since November 1931, it has operated an air transportation service between Miami, Florida, and Buenos Aires by way of points in the Caribbean and on the east coast of South America. In addition to that service, and others, Pan American Airways, Inc., has operated services between Miami and the Canal Zone and between Brownsville, Texas, and the Canal Zone, making connections at the Canal Zone with the services of Panagra.

"The route between Miami and Buenos Aires via the Canal Zone and Panagra's west coast route is shorter than the route of Pan American Airways, Inc., between Miami and Buenos Aires via east coast points and the so-called Brazilian cut-off. At no time has Panagra operated regular air transportation service north of the Canal Zone. Although traffic between the United States and points on the west coast of South America and Buenos Aires constitutes a large and important part of Panagra's total business, this traffic has been carried between the United States and the Canal Zone by other carriers, largely by Pan American Airways, Inc., and at that point delivered to or received from Panagra for onward transportation. Most of the business interchanged by Pan American and Panagra at the Canal Zone is carried over Pan American's Miami-Canal Zone route, and originated in or is destined to the eastern seaboard of the United States. Other important contributions to Panagra's traffic flow are made to or from the Canal Zone through the Brownsville gateway served by Pan American's subsidiary, Compania Mexicana, S. A. Some traffic originating on or destined for the north coast of South America is also interchanged with Panagra at the Canal Zone. In addition, Pan American Airways, Inc. has recently been authorized to serve New Orleans, and New Orleans-Canal Zone service via Central America will enable traffic to be interchanged with Panagra at the Canal Zone * * * Since its incorporation * * * Panagra's commercial operations at all times have been confined to the transportation of passengers, cargo, and mail between the Canal Zone and points in South America. While a large proportion of its total traffic has consisted of traffic flowing between the United States and South America, that traffic has been moved north of the Canal Zone by other carriers."

For many years Grace has sought to have Panagra apply to the Board for an extension of its route from the Canal Zone to the United States; but Pan American, through its 50% voting power, has consistently prevented Panagra from making an application for such an extension. Pan American asserted that the letter-agreement of August 31, 1928, did not contemplate such a development. The minutes of a meeting of Pan American's board of directors held December 28, 1938, contain the following: "It was the sense of the meeting that it would not be in the interest of our stockholders for our directors to authorize an application by Pan American-Grace Airways, Inc. to extend north of Cristobal in competition with Pan American Airways, Inc."

On February 14, 1939, Grace and Pan American made the following agreement:

"1. One of the Grace directors of Panagra (who shall also be a director of Grace) will be elected President of Panagra and placed in responsible charge of the management of the company. If at any time the Company's affairs are not being conducted to Pan American's reasonable satisfaction, then the President will resign. 2. Pan American will inaugurate on or before April 1, 1939, a second direct trip

between Miami and Cristobal, and will maintain an adequate direct connecting service between Miami, or some other United States port agreed upon, and Cristobal, connecting with Panagra's through mail schedules. If at any time Pan American shall not comply with the foregoing, then Pan American will cause its directors on the Board of Panagra to take such action as will permit Panagra's applying to the C. A. A. for a certificate to operate this connecting service, provided that, irrespective of any determination made as provided in paragraph 4, Pan American shall not be in any way precluded from maintaining before the C. A. A. that its service is satisfactory and should be continued and that no other service is required in the public interest. With the exception of the second direct trip between Miami and Cristobal above referred to, Pan American shall not be obligated to operate any schedules and services not designated by the Post Office Department as mail schedules but will use their best efforts to have designated as mail schedules any additional trips required to make connection with any increase in Panagra's through mail schedules. 3. It is agreeable to the parties that Pan American-Grace shall continue to utilize the respective services of Grace and Pan American and pay service fees in the same proportion as presently allowed; provided that the services to be rendered by the respective parties are satisfactory to Pan American-Grace. 4. Any disputes arising under this general plan and every phase thereof including, without limiting the generality of the foregoing, determination of 'Pan American's reasonable satisfaction' referred to in paragraph 1 above and of 'adequate direct connecting service' referred to in paragraph 2 above, which cannot be settled by the Board of Panagra, shall be determined by Messrs. D. S. Iglehart and C. V. Whitney. If Mr. Iglehart or Mr. Whitney shall be unable to act, or unable to agree in connection with any matter arising under the foregoing paragraphs, then, unless otherwise agreed between Grace and Pan American, such matters shall be determined by arbitration by an arbitrator or arbitrators appointed by Messrs. Iglehart and Whitney, or failing such appointment, by three arbitrators, one appointed by Grace, one by Pan American, and a third by these two, and the party adjudged in default shall, at the discretion of the Arbitrator, be given such reasonable time to correct the default as the Arbitrator may fix. 5. This agreement shall continue to February 1, 1944, and thereafter until cancelled by Pan American or Grace on six months' written notice."

A meeting of Pan American's directors held January 7, 1941, adopted the following resolution: "Resolved, that the Corporation, as owner of half of the stock of Pan American-Grace Airways, Inc., should decline to acquiesce in the filing by Pan American-Grace Airways, Inc., of an application for a certificate of convenience and necessity between the Canal Zone and New Orleans, Louisiana, and that the representatives of the Corporation upon the Board of Directors of Pan American-Grace Airways, Inc., should not attend the meeting of such Board of Directors called for the afternoon of January 14, 1941, to act upon such proposal, or any adjournment thereof, and, except upon further instructions from the Executive Committee or the Board of Directors, should not attend any other meeting of the Board of Directors of Pan American-Grace Airways, Inc., at which action is to be taken upon the subject matter above described." At a meeting of Pan American's directors held on July 1, 1941, this action was reaffirmed on the ground that it "would not be in the interest of" Pan American or Panagra "or in the public interest."

The Civil Aeronautics Board, in its opinion of May 24, 1944 in the present proceedings (known as Board's Docket No. 779) said:

"On December 16, 1941, Grace filed a petition and complaint, Docket No. 707, requesting the Board to institute a proceeding pursuant to section 401(h) of the Act to alter, amend, and modify Panagra's certificate of public convenience and necessity so as to make the northern terminal of its route a point in the United States such as Miami or Tampa, Florida, or New Orleans, Louisiana. On April 29, 1942, Grace filed a second complaint, Docket No. 744, requesting the Board to require Pan American Airways Corporation pursuant to section 411 of the Act, 49 U.S.C.A. § 491, and sections 7 and 11 of the Clayton Act, 15 U.S.C.A. §§ 18, 21, to cease and desist from certain matters alleged by Grace to be in violation of those sections, and to divest itself of its ownership of the stock of Panagra to the extent necessary to divest itself of its present negative control of Panagra; and also renewing its request in Docket No. 707. No formal steps were taken by the Board in connection with the

Grace petitions in Dockets Nos. 707 and 744 until September 1942 * * * However, the Board did explore the possibility of working out a voluntary settlement of the controversy between Pan American and Grace. Numerous conferences were held by the Board with both parties. Finally, the Board suggested that the parties enter into an agreement under which sufficient shares of the two stockholders would be transferred to an independent public voting trustee or trustees to permit the election to the Panagra Board of an independent public director or directors, or under which such an independent public director or directors might be otherwise appointed, who would be able to break the deadlock resulting from the equal division of the ownership of Panagra stock between Pan American and Grace. After it became apparent that no satisfactory voluntary arrangements could be mutually agreed upon by the parties and that all efforts to mediate the differences between them would be unsuccessful, the Board, on September 10, 1942, issued its order * * * as amended by its order of October 22, 1942 * * * instituting the present proceeding * * *" [1]

Grace's petition, filed April 29, 1942 (Docket No. 744), consisted of a letter to the Board with an accompanying "Statement of Facts." The Board's Regulations provided: "Complaints may be made to the Board informally by letter * * *"

The order of September 10, 1942, entitled Docket 779, read as follows:

"It appearing to the Board:

"1. That W. R. Grace & Co. (hereinafter called "Grace") and Pan American Airways Corporation each own 50 per cent of the stock of Pan American-Grace Airways, Inc. (hereinafter called "Panagra"); and

"2. That Grace has filed with the Board a petition (Docket No. 707) for the alteration, amendment and modification of the certificate of public convenience and necessity of Panagra pursuant to section 401(h) of the Civil Aeronautics Act of 1938, as amended, so as to name a point within the United States as a terminal of Panagra's route; and

"3. That Grace alleges in said petition that Panagra's primary function is to provide air transportation over its route for passengers, property, and mail between the United States and the west coast of South America; that at the present time Panagra is dependent on Pan American Airways, Inc. (hereinafter called "Pan American"), a wholly owned subsidiary of Pan American Airways Corporation, for connecting service between the United States and the Canal Zone; and that such connecting service has been unsatisfactory for the reason alleged in said petition; and

"4. That unsatisfactory connecting service, if such exists, may result in air transportation service to the public between the United States and the west coast of South America which is inadequate and deficient as to both quality and quantity, and may also result in retarding the proper and sound development of air transportation service between the United States and the west coast of South America; and that such results would not be in the public convenience or necessity or in the public interest as defined in section 2 of said Civil

---

[1] The Board's effort to work out "a voluntary settlement of the controversy between Pan American and Grace" apparently continued even after these orders for hearing issued. For on October 28, 1942, Grace wrote the Board as follows: "We accept your suggestion in principle and, for the duration of the war, agree to the immediate addition to Panagra's Board of an odd director (satisfactory to both stockholders) who might also serve as Chairman of the Board, with the understanding that this individual will be free to decide independently and without limitation, and on the basis of Panagra's being an independent entity, all matters involving Panagra's operations without regard to which the Pan American and Grace directors may be unable to agree. Such an arrangement accomplishes the same purpose as establishing a voting trust along the lines you suggested, while being less complicated and more easily put into effect. For reasons pointed out this morning, the suggestion of Pan American that there be an odd director appointed, who would only have 'power to break any deadlock on any questions arising in connection with operations of the company that fall within the scope of the dedication of capital made by the two stockholders' begs the entire question. Grace and Pan American are not in agreement as to what is the proper scope of the company's operations, and fourteen years' experience has shown that such deadlocks as arise almost invariably revolve around this very issue which Pan American wishes to exclude from the jurisdiction of the odd director."

Aeronautics Act of 1938 as amended [49 U. S.C.A. § 402]; and

"5. That Pan American is the only air carrier authorized at the present time to engage in air transportation between the United States and South America, and that an additional service by another air carrier may provide competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense; and

"6. That Grace in its petition, Docket No. 744, alleges that Panagra, because of the opposition of its 50 per cent stockholder, Pan American Airways Corporation, is not authorized by its Board of Directors and stockholders to make application to this Board for the amendment of its certificate of convenience and necessity so as to provide for said terminal in the United States; and

"The Board finding that its action herein is necessary in order to carry out the provisions of, and to exercise and perform its duties under the Civil Aeronautics Act of 1938, as amended, and acting upon its own initiative and pursuant to the powers and duties vested in it under Titles II, IV and X of the Civil Aeronautics Act of 1938, as amended, particularly section 401(h) thereof;

"It is ordered:

"1. That a proceeding is hereby instituted by the Board to determine whether the public convenience and necessity require that the certificate of public convenience and necessity of Panagra should be altered, amended and modified to authorize and require (a) that Panagra's route terminate in the United States at Miami or Tampa, Florida; New Orleans, Louisiana; Brownsville or El Paso, Texas; Los Angeles, California; or at two or more of said points; and (b) in the event a terminal or terminals in the United States are authorized and required pursuant to this proceeding, that Panagra serve one or more intermediate points between the Canal Zone and said terminal or terminals in the United States; and

"2. That Panagra, Grace and Pan American are made parties to this proceeding; and

"3. That this proceeding be assigned for public hearing before an examiner of the Board at a time and place hereafter to be designated."

The amending order of October 22, 1942, provided in part that "paragraph 1(a) of the aforesaid order of the Board dated September 10, 1942 (Order Serial No. 1928) be and it is amended by striking out the words 'Miami or Tampa, Florida; New Orleans, Louisiana; Brownsville or El Paso, Texas; Los Angeles, California,' and inserting in lieu thereof the words 'Miami, Tampa or St. Petersburg, Florida * * *'"

Pan American filed a petition to intervene, which the Board granted. Pan American then filed an answer in which it stated that it was an answer to the petitions filed by Grace in Dockets Nos. 707 and 744. Pan American in this answer asked that the Board consider whether Grace, because of its interest in Panagra, was violating § 408, 49 U.S.C.A. § 488.

Eastern Air Lines, Inc., was permitted to intervene. It asked the Board to consolidate the hearing with Eastern's application (Docket No. 782) for a certificate to engage in transportation between the Canal Zone and divers points in the United States. Similar motions for consolidation were made by three other carriers. In its amending order of October 22, 1942, the Board said: "That all requests and motions for consolidation of other applications and dockets with this proceeding are hereby denied."

In pre-hearing conferences, Pan American asked that Grace be required to furnish exhibits bearing on its alleged violation of § 408. In a supporting memorandum, Pan American referred to "Grace's complaints in Dockets No. 707 and 744 which form the background of this proceeding * * *" In reply, Grace contended that the Board should not go into the question of Grace's violation of § 408 because the "scope of Docket No. 779 does not include the issues raised by Grace in Docket No. 744 with respect to Section 411 * * * If the Board wishes to pursue this subject [questions of corporate control and management] further, it should grant the petition of Pan American for an investigation under Section 415 of the Civil Aeronautics Act, just as it should institute proceedings under Section 411 as requested by Grace in Docket No. 744 if it wishes to pursue all the questions raised by Grace in Docket No. 744. These, we submit, should, in any event, be separate proceedings from

the instant one, so as not to delay or obstruct the prompt disposition of this proceeding. Grace does not believe that the Board should go into those issues here or the extensive and complicated issues as to the applicability of Section 408 when it is abundantly apparent that neither Section 408, 411 or 415 is relevant to the instant proceeding." The Examiners ruled that the information requested by Pan American and Grace be furnished.

The Department of Justice, which was permitted to intervene, urged, early in the hearing, that the issues under the "complaint" as to monopoly should be resolved before the Board heard evidence as to amendment of Panagra's certificate,[1a] but the Examiners did not adopt that suggestion.

In the Report of the Prehearing Conference, dated December 31, 1942, the Examiners said, "The Examiners make it clear that this proceeding would be restricted to a consideration of the issues arising under § 401 in connection with the inauguration of additional Air service between the Canal Zone and Florida, and that they would not allow the introduction of testimony and exhibits that are *solely* [1b] related to the Board's investigation in Docket No. 744." The Examiners apparently agreed with a statement of the Board's Public Counsel that some of the factual background relevant to the investigation in Docket No. 744 should be considered in the Docket No. 779 proceeding, that "the family difficulties within * * * Panagra are pertinent to the question of the carrier to be selected; * * * [to the question] whether Panagra is fit and able to extend its present route into the United States."

At the hearing, counsel for Pan American offered in evidence Grace's petition filed April 29, 1942 (Docket No. 744). Grace objected, and one of the Examiners, after noting that the proceeding did "not include Docket No. 744," said, "Of course, this is a matter on file with the Board to

which it may make reference, and I see no reason for incorporating it in this case. It is a public document, a formal document before the Board, in which a certain position has been taken and if argument is necessary and if it is desirable to argue on it, it seems to me you can argue from the other document as well as incorporating it in this record * * * I am not quarreling as to the admissibility. I am merely saying that the Board can take cognizance of it just as well on its file as it can * * *" Counsel for Pan American interrupted to say, "If your ruling is that we can refer to it in brief and argument—to which the Examiner replied, "That is the ruling."

During the hearing, when counsel for Grace objected to a certain line of inquiry, the Examiner said:

"Examiner Brown: Mr. Cahill, we have got to make it clear that we have got a very wide investigation. In the exhibits that have been submitted not only by Pan American but also by Grace and by Panagra, we have gone into details concerning the organization and development of this company back from the days of its early inception. We have gone into matters of the minutest detail, concerning the operations and the conflict of interests which have arisen, and we have gotten into questions concerning control under Section 408 of the Act, and while I agree that this investigation was for the purpose of determining whether or not Panagra should be extended from the Canal Zone to the United States, those issues are in here and we might just as well face it, and that is what we are going to have to hear." And the Board's counsel remarked: "* * * we are getting so far away from our convenience and necessity * * * that we don't even recognize [a question of convenience and necessity] when we see it."

At any rate, before the hearing was ended, many pages of evidence relevant to the issues raised in Grace's petitions were received in addition to material relevant to Pan American's countercharges.[1c]

---

[1a] It also urged that the issue of Panagra's fitness, ability and willingness to conduct the proposed new operations was intertwined with, and could not be decided without consideration of, the issue arising from the dual ownership of Panagra.

[1b] Emphasis added.

[1c] Thus evidence was received bearing on Grace's efforts for, and Pan American's against, the extension of Panagra,

up to the time of the hearing; of the alleged failure of the Pan American directors of Panagra to cooperate with efforts of the Grace directors to extend Panagra's route, and the alleged attempts by Pan American to exact payment from Panagra before giving consent to proposed extensions. The record also contains testimony in regard to the opposition of Pan American to the extension of Panagra

At the beginning of the hearing, Pan American had moved to dismiss the proceeding for want of jurisdiction in the Board. The Board denied this motion without prejudice to its renewal at the close of the hearing. When the hearing before the Board's Examiners closed, Pan American renewed its motion, asking that it be set down for argument before the Board heard argument on the merits. The Board granted this request. Grace then filed a counter-motion asking deferment of argument on the jurisdictional issue until final argument on the merits. The Board entered an order, dated December 17, 1943, denying the cross-motion. After hearing argument on the motion to dismiss, the Board on May 24, 1944, entered an order, accompanied by an opinion, dismissing the proceeding for want of jurisdiction.

In its opinion of May 24, 1944, the Board said, inter alia:

"Since its incorporation in 1929 Panagra's commercial operations at all times have been confined to the transportation of passengers, cargo, and mail between the Canal Zone and points in South America. While a large proportion of its total traffic has consisted of traffic flowing between the United States and South America, that traffic has been moved north of the Canal Zone by other carriers. The extension of Panagra's system referred to in the order instituting the present proceeding would give the carrier direct access to one or more of the major gateways for through traffic between the United States and Latin America. The extension would permit it to connect directly with the domestic air transportation system of the United States, without the necessity of relying upon the connecting services of Pan American and other carriers operating in the foreign field for access to traffic flowing to and from the continental United States. The extension would increase the route mileage of Panagra approximately 1200 miles, or about 14 per cent of its existing mileage. It is estimated that the extension initially would require an additional capital investment on the part of Panagra of around $800,000 which compares with Panagra's gross assets at the end of 1942 of $10,700,000 and its net worth, exclusive of goodwill, of over $3,000,000.

"In the light of the conditions surrounding the extension here involved we conclude that the requiring of the extension would not be within the power granted the Board by section 401(h) to 'alter, amend, [or] modify' Panagra's certificate. The length of the mileage of the new service and the amount of additional investment required to operate it have been factors in reaching this conclusion. However, the principal consideration which influences us is the fact that to extend the Panagra system from the Canal Zone to a point in Florida would constitute a basic transformation of the character of the carrier. Panagra, now a connecting carrier as to through traffic between the United States and South America, would be made a carrier directly serving that traffic—and serving it moreover in competition with an affiliated company. There is a fundamental difference between the position of a carrier whose routes stop so far short of the continental United States as those of Panagra and which depends upon connecting carriers for access to traffic to and from that area, and a carrier which has direct access to the continental United States over its own system. It does not seem reasonable to believe that Congress contemplated that such a change in the character of a carrier's system should be compelled by Government order. We find, therefore, that the extension of Panagra's route from the Canal Zone to the United States would not be an alteration, amendment, or modification of its certificate within the meaning of section 401(h) of the Act in the

---

into areas where it would compete with Pan American subsidiaries and with Scadta, in which Pan American had a substantial interest. The differences between Grace and Pan American directors as to types of equipment, radio facilities and publicity techniques were all aired at the hearing, as were Grace's charges that Pan American had used unfair competitive practices in its failure to furnish adequate connecting service to Panagra. There is also evidence in regard to Pan American's

alleged efforts to divert Post Office patronage from Panagra to Pan American. In addition there is evidence bearing on Pan American's charges that Grace's interest in the Grace Line, and representation of Panagra in South America by the agencies of Grace, were detrimental to Panagra.

This summation is not exhaustive, but merely illustrative of the material which appears in the record in Docket No. 779.

sense that the Board could compel such an extension in the absence of an application from Panagra.

"Regardless of which of the co-owners of Panagra is at fault, the very fact that controversy of this kind has developed indicates that an unhealthy condition exists in the internal affairs of the company. A decision by the Board, after consideration on the merits, of the question of whether or not Panagra's routes should be extended to some point or points in the continental limits of the United States would remedy one particular controversy between the co-owners; but it would not solve the basic difficulties of the Panagra joint ownership. This is an inherently bad situation. Deadlock between the two interests equally represented in the ownership of the company is always possible, and certain to occur from time to time, especially in view of the special interests and the other activities of the two co-owners. We have sought remedy under the Civil Aeronautics Act, but after having the facts presented in extensive public hearings, we must conclude that the Act does not give the Board the power to take the action contemplated by this proceeding."

By an order of August 5, 1944, the Board denied Grace's petition for reargument and reconsideration in which Grace (without referring to Section 411) had requested the Board to vacate its dismissal order and remand the case to the Examiners for a report on the facts relating to the issue of jurisdiction and to the merits. Grace then petitioned this Court to review the orders of December 17, 1943, of May 24, 1944, and of August 5, 1944. Pan American, and Eastern Air Lines, Inc., moved to dismiss that petition. In its brief filed in this court in support of its motion to dismiss, Pan American said that "the proceeding in Docket 779 * * * was instituted not only under Section 401(h), but also under Title II and X of the Act, which supply the Board with investigatory authority (Sections 205(a) and 1002(b))." Eastern also, in its briefs in this court, referred to the action of the Board as in part under § 1002(b).

In its petition to review the Board's order, Grace alleged, inter alia: "The Board erred in taking into consideration as bearing on its jurisdiction under § 401 (h) of the Civil Aeronautics Act, any controversy between the co-owners of Panagra." The petition did not refer to the Board's failure to take action under § 411, but it concluded with a prayer "that petitioner have such and other further relief as to the Court may seem just and proper in the premises."

Sections of the Act cited on this appeal read as follows:

"Section 2. Declaration of policy. In the exercise and performance of its power and duties * * * the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity—(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense; * * * (c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; (d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense * * *."

"Section 411. The Board may, upon its own initiative or upon complaint by any air carrier or foreign air carrier, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier or foreign air carrier has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation. If the Board shall find, after notice and hearing, that such air carrier or foreign air carrier is engaged in such unfair or deceptive practices or unfair methods of competition, it shall order such air carrier or foreign air carrier to cease and desist from such practices or methods of competition."

"Section 1002(a). Any person may file with the Board a complaint in writing with respect to anything done or omitted to be done by any person in contravention of any provision of this chapter, or of any requirement established pursuant thereto. If the person complained against shall not satisfy the complaint and there shall appear to be any reasonable ground for investigating the complaint, it shall be the duty of the Board to investigate the

matters complained of. Whenever the Board is of the opinion that any complaint does not state facts which warrant an investigation, or action on its part, it may dismiss such complaint without hearing. * * * (c) If the Board finds, after notice and hearing, in any investigation instituted upon complaint or upon its own initiative, that any person has failed to comply with any provision of this chapter or any requirement established pursuant thereto, the Board shall issue an appropriate order to compel such person to comply therewith."

"Section 401. Certificate of public convenience and necessity. * * * (d) (1) The Board shall issue a certificate authorizing the whole or any part of the transportation covered by the application, if it finds that the applicant is fit, willing, and able to perform such transportation properly, and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder, and that such transportation is required by the public convenience and necessity; otherwise such application shall be denied. (2) In the case of an application for a certificate to engage in temporary air transportation, the Board may issue a certificate authorizing the whole or any part thereof for such limited periods as may be required by the public convenience and necessity, if it finds that the applicant is fit, willing, and able properly to perform such transportation and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder. * * * (h) The Board, upon petition or complaint or upon its own initiative, after notice and hearing, may alter, amend, modify, or suspend any such certificate, in whole or in part, if the public convenience and necessity so require, or may revoke any such certificate, in whole or in part, for intentional failure to comply with any provision of this subchapter or any order, rule, or regulation issued hereunder or any term, condition, or limitation of such certificate: Provided, That no such certificate shall be revoked unless the holder thereof fails to comply, within a reasonable time to be fixed by the Board, with an order of the Board commanding obedience to the provision, or to the order (other than an order issued in accordance with this proviso), rule, regulation, term, condition, or limita-

tion found by the Board to have been violated. Any interested person may file with the Board a protest or memorandum in support of or in opposition to the alteration, amendment, modification, suspension, or revocation of a certificate."

Cahill, Gordon, Zachry & Reindel, of New York City (John T. Cahill, Fred J. Knauer, Elmer J. Kelsey, and William F. Kennedy, all of New York City, of counsel), for petitioner.

Wendell Berge and George C. Neal, both of Washington, D. C. (James E. Kilday, of Washington D. C., Lawrence S. Apsey, of New York City, Edward Dumbauld and John H. Wanner, both of Washington, D. C., and Louis W. Goodkind, of New York City, of counsel), for Civil Aeronautics Board.

Root, Clark, Buckner & Ballantine, of New York City (Henry J. Friendly, James P. Kranz, Jr., and John P. Apicella, all of New York City, of counsel), for Pan American Airways Corporation.

Gambrell & White, of Atlanta, Ga. (E. Smythe Gambrell, W. Glen Harlan, and Harold L. Russell, all of Atlanta, Ga., of counsel), for Eastern Air Lines, Inc.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■■■ 1. It has been suggested that the Board should have considered and decided the issue of the violation of Section 411 by treating the proceeding as if it involved Grace's petition No. 744.[2] But the scope of this proceeding (No. 779) is to be measured, we think, by the directory part of the Board's order of September 10, 1942; not by its recitals, save as these may be necessary to throw light upon the rest; nor by what the parties said in their arguments and briefs, or in the course of the hearings. Of course, we do not mean that the order finally fixed the issues; but we think it did so in the absence of some amendment plainly intended to change them. Turning then to the order, the proceeding was "to determine whether the public convenience and necessity require that the certificate of public convenience and necessity of Panagra should be altered." The proceeding was therefore under § 401 (h); and such we think it remained throughout, for the recital about No. 744.

[2] In an appendix to this opinion we have stated, in some detail, the contentions in support of that position.

served no further purpose than to allege that the Pan American Company was preventing Panagra from itself making the application. It would be too much to say that the Board treated the proceeding as a continuation of No. 707. But it came nearly to the same thing after Grace & Company had been cited in, and Pan American had been made a party by intervention, for No. 707 had also been addressed to the same issue of "public convenience and necessity." The Board never carried through this purpose: eventually it felt itself foreclosed, because it did not treat Panagra as an applicant for the extension, and that limited the inquiry to whether the facts justified forcing such an extension upon an unwilling carrier. Once the Board had decided that they did not, it became impossible to go on with the original issue of public convenience and necessity; and the proceeding necessarily came to an abortive end. We will assume for argument that the Board was right in its holding, if Panagra was to be regarded as an unwilling carrier, and if therefore the only issue was whether the proposed extension could be forced upon it. That was indeed an issue with which the Board was peculiarly qualified to deal, and the new competition which the extension would invite—to say nothing of its expense— may well have put the extension outside those additional burdens which a licensee impliedly accepts as part of the control to which his rights are in any event subject. Unless therefore it was within the power of the Board to inquire into the right of Grace & Company to speak for Panagra, and by doing so to make the application a voluntary one, it may well be that the order was right. If on the other hand the Board had power to make that inquiry, it could have pressed the proceeding to a conclusion along the lines on which it had been initiated, and we think that this is what it should have done.

In Pittsburgh, etc., R. Co. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980, the Supreme Court held that, in reviewing an order of the Interstate Commerce Commission, the court might not examine whether the majority shareholders of a railroad, a party to the proceeding, were abusing their power in taking the position in the proceeding which they did. Such an inquiry was to be reserved for a separate suit, and could not be interjected into the controversy before the Commission. In spite of some differences which we will point out, we might feel that decision conclusive here, were it not for the decision in American Power & Light Co. v. Securities and Exchange Commission, 325 U.S. 385, 65 S.Ct. 1254; particularly that part of it which dealt with Okin's appeal. Okin, the court said, had no interest in the proceeding before the Commission different from any other shareholder's; he could speak only for his class and his claim was therefore necessarily derivative. Since he was allowed to appeal, we can see no escape from concluding that he had a standing to assert a right of the Electric Bond & Share Company.[3] If he had not, he had no standing at all—unlike the American Power & Light Company, which had an individual grievance. His power so to speak for the company depended upon his allegation that the action of the directors was actuated by "illegality and fraud" (325 U.S. at page 392, 65 S.Ct. at page 1257) which made futile any recourse to the management. In accord with this, it seems to us that, if Grace & Company could prove that the opposition of Pan American (the parent company, for we disregard the subsidiary) to Panagra's applying for an extension was due to "illegality and fraud," it would follow that

[3] The Supreme Court, after what appear to be conflicting decisions as to whether a person with sufficient interest to become a party to a proceeding before an administrative agency has enough of an interest to maintain court review of that agency's order entered in that proceeding, recently stated that the question is now open and undecided. See Alton R. Co. v. United States, 315 U.S. 15, 19, 62 S.Ct. 432, 86 L.Ed. 586; Chicago Junction Case, 264 U.S. 258, 267, 44 S.Ct. 317, 68 L.Ed. 667; Sprunt & Son v. United States, 281 U.S. 249, 255, 50 S.Ct. 315, 74 L.Ed. 832; Pittsburgh & W. V. R. Co. v. United States, 281 U.S. 479, 486–488, 50 S.Ct. 378, 74 L.Ed. 980; cf. Associated Industries v. Ickes, 2 Cir., 134 F. 2d 694, 711, 712 and note 57.

In other words, the interest necessary to maintain court review has been regarded as at least as great as, if not greater than, that necessary to participate in proceedings before the agency. Consequently, one who, like Okin (and therefore like Grace), has the status to initiate judicial review would seem clearly to be entitled to initiate an administrative proceeding.

this proceeding should be regarded as a voluntary application for the extension; and then it would be open to the Board to decide the issue of public convenience and necessity.[4] Certainly there is everything to be said in favor of such a course, if it is possible. To await the outcome of a suit brought in a court to direct Panagra to apply for the extension, would be at best dilatory and vexatious, and there are other and more important reasons against it.

■ The issues, upon which such a shareholder's suit would depend, would be whether the Pan American Company was opposing the extension because it was pursuing its own advantage to the prejudice of the joint interest ("fraud"), and because it was engaging in some unfair trade practice ("illegality"). Both those issues demand the same specialized acquaintance with commercial aviation and its ramifications as a decision upon the public convenience and necessity of the extension itself. No court, state or federal, would have that acquaintance; by hypothesis the Board does have it, and the Board alone. To remove the decision from the Board, not only duplicates the time and labor, but subjects the result to the final determination of a relatively incompetent tribunal; for, if the court should decide that the Pan American Company's refusal was neither oppressive, nor unlawful, there would be an end of this proceeding, and of No. 707. It might, however, still be possible for the Board under § 411 to order the Pan American Company to "cease and desist" from any unfair trade practices in which the Board—differing from the Court—might think it engaged; but surely such a conflict between court and Board would be to the last degree undesirable, re-gardless of the possible insufficiency of the available remedies. For these reasons it seems to us that in this proceeding the Board had power to determine, as between Grace & Company and the Pan American Company, which should speak for Panagra. Needless to say, we suggest nothing as to the proper outcome of that inquiry.

■ There remains only the question whether the Board would be justified in refusing to introduce that controversy into this proceeding, and in reserving it for either No. 707 or No. 744. In the first place it does not appear that, if the Board had believed the power to exist, it would have refused to press the proceeding to a conclusion; but, even if it would have refused, we should not concur. True, the Board must have very wide latitude in deciding in what order to take up the issues in any litigation (Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656); but Ashbacker Radio Corporation v. Federal Communications Commission, 326 U.S. 327, 66 S.Ct. 148, decided that there may be practical reasons for not determining part of an indivisible controversy in advance, even though the first decision will not be conclusive. In the case at bar more than four thousand pages of evidence had been taken and the record was complete, before the Board finally decided the motion which had been pending from the outset. It may prove possible in a separate hearing later to be called in No. 707 to introduce the evidence so taken; but we can see no conceivable reason, except a defect of power, for adopting so futile and dilatory a course.[5] Arguendo, one might even agree that it might have been convenient in limine to decide whether the extension could be forced upon Panagra in

---

[4] The Board tells us that in other cases it has treated consents by carriers, filed in section 401(h) proceedings, as voluntary petitions for extensions under § 401(d). We think that a correct conclusion.

[5] More than four years have elapsed since Grace, on December 16, 1941, filed its petition (No. 707) but the Board has not yet acted thereon. It is not impossible that should the Board much longer delay, and then decide that the extension should be granted to Panagra, its action might be frustrated by the intervening grants of licenses to other carriers.

Indeed, in the briefs of the parties we are told the following facts which do not appear of record: Since the date when the Board dismissed the present proceedings, other carriers have applied for certificates covering routes between the Canal Zone and the United States, and the Board has held a consolidated hearing on such applications known as the Latin American Proceeding (Docket No. 525 et al.). In that consolidated hearing, the Board's Examiners and its Public Counsel have reported that, while the public interest would best be served by the extension of Panagra to a United States terminal, they considered that recommendation foreclosed by the Board's decision in the proceedings now before us, and consequently they recommended that routes be-

invitum, reserving the trial of any other issues. But to frustrate the whole undertaking when it lay ripe for final conclusion was, we think, beyond even that generous latitude which must be accorded to the Board's discretion. Hence we conclude that the Board should be directed to decide whether Panagra should be treated as applying for the extension; and if that turns out to be true, whether the public convenience and necessity require the extension to be granted. These two issues being intricately intermeshed, as we have said, we do not mean that they should be decided seriatim. Logically, indeed, they do arise in the order we mention, but the very purpose of joining them would be in part defeated if both were not decided together.

 Whether the agreements of August 31, 1928 and February 14, 1939, violated the anti-trust laws will not affect the issues. For, even if those agreements were legal, it does not follow that Pan American is not using its voting power in Panagra illegally. And even if the agreements, when made, were in violation of the anti-trust laws, Grace would not be thereby estopped from asking to be relieved of them; a party to a contract violative of a statute cannot be estopped from repudiating it when such repudiation will further the very public interest which the statute was designed to protect.[6]

Remanded.

## Appendix

We think it well to set forth the following arguments which we have not found it necessary to consider but which have been advanced to support a not altogether dissimilar conclusion.

It is urged that the Board, when it issued its hearing order of September 10, 1942, had in mind Section 411, which is to be read in the light of Section 2(a), (c) and (d). For, it is suggested, from the face of that order and from the explicit statements in the Board's opinion of May 24, 1944, describing the facts leading up to that order, the following appears: Grace, on December 16, 1941, filed a petition (called Docket No. 707) asking the Board to amend Panagra's certificate to extend its route from the Canal Zone to the United States. On April 29, 1942, Grace filed what the Board describes as a complaint (called Docket No. 744), pursuant to § 411, asking the Board to require Pan American to cease and desist from actions (alleged by Grace to be in violation of § 411), and ordering Pan American to divest itself of its ownership of Panagra stock to the extent necessary to rid itself of its "negative control" of Panagra; in this complaint Grace renewed the request made in its previous petition (Docket No. 707). As the Board stated in its opinion, "no formal steps were taken by the Board in connection with the Grace petitions in Dockets No. 707 and 744 until September 1942." Then—according to the Board's own opinion—on September 10, 1942, the Board took such "formal steps in connection with the Grace petitions" by issuing its order (in what it called Docket No. 779) directing a hearing. The recitals of that order, it is said, make it plain that, although the Board stated that it was "acting upon its own initiative," the Board called that hearing because of the Grace petitions. Nor, it is argued, was § 411 disregarded, for the order recited that the Board was proceeding "pursuant to the powers and duties vested in it under Titles II, IV and X of the Civil Aeronautics Act of 1938, as amended, and particularly § 401(h) thereof," and Title II of the Act includes § 411. (Pan American, in one

---

tween the United States and the Canal Zone be awarded to other carriers.

The Public Counsel, in his brief before the Examiners in Docket No. 525, said: "Probably Panagra carries this traffic as far on its own system as the distance between Balboa and New York or Miami. This fact, in addition to the fact that Panagra has carried this traffic for a number of years, would seem to entitle Panagra to a certificate for this route. Such an authorization would also provide the greatest public convenience. However, as is well known, the Panagra directors representing Pan American have refused to approve an application for such an extension. Thus, Pan American, through its 50 percent ownership, has prevented the countries on the west coast of South America from realizing the convenience of a one-carrier service from a United States carrier. Since we are prevented by this action of Pan American from recommending the best possible service, we must turn to the next best solution."

[6] See, e. g., Cleveland, C. C. & St. L. R. Co. v. Hirsch, 6 Cir., 204 F. 849, 858, 859; Scott Paper Co. v. Marculus Mfg. Co., 66 S.Ct. 101; 12 C.J.S., Cancellation of Instruments, § 46, p. 1019.

of its briefs in this court, contends that the proceeding "was instituted not only under § 401(h), but also under Titles II and X * * *") Also prominent in the recitals of the Board's order are the statements that "unsatisfactory connecting service, if such exists, may result in air transportation service to the public between the United States and the west coast of South America which is inadequate and deficient as to both quality and quantity, and may also result in retarding the proper and sound development of air transportation service between the United States and the west coast of South America; and that such results would not be in the public convenience and necessity or in the public interest as defined in section 2 of said Civil Aeronautics Act of 1938, as amended; and that Pan American is the only air carrier authorized at the present time to engage in air transportation between the United States and South America, and that an additional service by another air carrier may provide competition to the extent necessary to assure the sound development of an air transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense."

It is then suggested that, just as in Ashbacker Radio Corporation v. Federal Communications Commission, 326 U.S. 327, 66 S.Ct. 148, so here the Board's decision as to its powers under § 401(h) without a simultaneous decision as to the alleged violation of § 411, may be seriously detrimental to the paramount public interest; and that therefore we must go behind the Board's present picture of the nature of its proceeding in Docket No. 779 and remand for Board determination, in that proceeding, of the issues under § 411.

The Board argues that the report of its Examiners (pursuant to the Board's regulation) resulting from the prehearing conferences, limited the scope of the hearing so as to preclude consideration of issues under § 411. Grace replies that in fact a vast amount of evidence pertinent to the issue under § 411 was received at the hearing, for it was recognized by everyone concerned that the relations between Pan American and Panagra affected both the issue of "public convenience and necessity" and the issue whether Panagra was "fit, willing, and able to perform" the services involved in the proposed extension of its route. It is also said that the Board's Regulation as to the Examiners' Report on a pre-hearing conference, states that such report "shall control the subsequent course of the proceeding, but it may be reconsidered and modified at any time to prevent injustice"; the Board, it is suggested, should now be required to adapt the scope of the hearing to conform to the proof received, giving full opportunity to the parties to introduce further evidence, so far as necessary, relevant to the issue under section 411.[7]

Pan American argues that it, as distinguished from its wholly-owned subsidiary, was not made a party to the hearing and therefore was not given adequate notice to justify an order affecting it under § 411. But, says Grace, Pan American, on its own motion, was allowed to intervene and was active throughout the entire hearing.

Referring to § 1006, 49 U.S.C.A. § 646, which provides that "no objection to an order of the Board shall be considered by the court unless such objection shall have been urged before by the Board," Pan American contends that the failure of the Board to proceed in Docket No. 779 under § 411 cannot be considered by us because Grace made no objection on that score before the Board. Grace replies that it objected to the Board's rejection of jurisdiction; and, since the Board's failure to act under § 411 involved a refusal by the Board to exercise its jurisdiction, Grace's objection was sufficient to raise that issue here, especially as Grace's right to maintain court review derives from the fact that it is vindicating the public interest, and this is not ordinary litigation between private persons.[8] In like manner Grace re-

---

7 It is suggested that that portion of the Board's amendatory order of October 22, 1942, denying "motions for consolidation of other applications and dockets with this proceeding" was ambiguous and that it may well have related not to Grace's petitions but to the motions of other air carriers to consolidate their applications for extensions with Docket No. 744; for, in April, 1942, the Board had announced that for the duration of the existing national emergency, no further action would be taken with respect to applications for authority to operate a new air transport unless special considerations of national interest were involved.

8 It is also noted that Grace's petition for review contains a prayer for "such other relief as to the court may seem just and proper in the premises."

plies to the contention that it is estopped to raise any issue under § 411 because, before the Examiners, it took the position that the hearing did not extend to its complaint under that section, and because, in its petition in this court to review the Board's order of May 24, 1942, it has not objected to the Board's failure to act under § 411.

Grace asserts that the words "unfair methods of competition" in § 411 were taken from the Federal Trade Commission Act; that those words in that Act have been held to include conduct violative of the Sherman Act;[9] and that a corporation violates the Sherman Act if it uses its voting power in another corporation to prevent competition between the two corporations.[10]

Pan American and the Board, however, argue that an order under § 411 may be directed only against an "air carrier," and that Pan American is not itself an air carrier, but merely a holding company completely owning Pan American Airways, Inc., which is an air carrier. *Per contra*, it is said that § 1(2) of the Act, 49 U.S.C.A. § 401(2), defines an "air carrier" to mean "any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation." It is further contended that a complaint under § 411 must be by an "air carrier" and that Grace is not such. But it is answered that, as Grace charges that Pan American is illegally using its position in Panagra to prevent competition, Grace properly filed a derivative complaint, on Panagra's behalf, under § 411; and that, were such derivative action not possible, a carrier illegally utilizing control of another carrier corporation could, with resultant injury to the public interest, block the victimized carrier from filing a complaint with the Civil Aeronautics Board in the manner contemplated by § 411.

Answering the contention that, even when a proper complaint is filed under section 411, the Board has an unreviewable discretion to decide whether it would be in the public interest to make such an investigation, it is said that here, by its own description of its action (in its September 10, 1942 order and its May 24, 1944 opinion), the Board has shown that it has already exercised that discretion, and that accordingly it could not arbitrarily abandon the hearing but should have continued it to find whether or not Pan American "is engaged in * * * unfair methods of competition," in which event the Board should have ordered Pan American to cease and desist.

It is also suggested that, in its hearing order, the Board said that it was acting, inter alia, under Title X of the Act, and that that Title includes § 1002. In a brief the Board says that, if Grace's petition filed April 29, 1942 (Docket 744), may be considered in this proceeding, then "Section 1002 of the Act may have a limited bearing. If Grace should be held not to be an air carrier under the Civil Aeronautics Act, and hence without standing to file a complaint under § 411 of the Act, subsection (a) of § 1002, which grants in broader language the right to file complaints for violations of the provisions of the Act, might be relied upon as a basis for Grace's pleading." These provisions, it is urged, seem to have been substantially borrowed from 49 U.S.C.A. §§ 13(1) and 15, under which it has been held that the Interstate Commerce Commission must exercise its jurisdiction when a complaint is filed.[11]

Before L. HAND, SWAN and FRANK, Circuit Judges.

### On Petitions for Rehearing.

PER CURIAM.

Pan American and Eastern have filed petitions for rehearing which we deny but which make desirable some additional comments.

■ 1. The petitions complain that we have held that the Board may and should consider a "private dispute between stock-

[9] Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534; Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Federal Trade Commission v. R. F. Keppel & Bro., 291 U.S. 304, 310, 54 S.Ct. 423, 78 L.Ed. 814.

[10] Baush Machine Tool Co. v. Aluminum Co., 2 Cir., 72 F.2d 236, 239, 240, certiorari denied 293 U.S. 589, 55 S.Ct. 104, 79 L.Ed. 683.

[11] See, e. g., I. C. C. v. Baird, 194 U. S. 25, 39, 24 S.Ct. 563, 48 L.Ed. 860; Louisville Cement Co. v. I. C. C., 246 U. S. 638, 642, 643, 644, 645, 38 S.Ct. 408, 62 L.Ed. 914; I. C. C. v. United States ex rel. Humboldt Steamship Co., 224 U.S. 474, 485, 32 S.Ct. 556, 56 L.Ed. 849.

holders" relating solely to the question "whether one stockholder has acted prejudicially to the corporate welfare." That complaint overlooks this basic assumption of our opinion: As the Board itself recognized in the recitals of its order of September 10, 1942, the declared policy of Congress set forth in § 2 of the Act, 49 U.S.C.A. § 402, not only makes paramount the "public interest" but also explicitly includes as an important factor, vitally affecting the public interest, "competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense." If, as that order of the Board indicates, the facts brought out at a hearing should show that the public interest required competition between Panagra and Pan American's wholly owned subsidiary, and that Pan American was improperly using negative control of Panagra to interfere with such competition, then the Board might find it necessary to take steps, authorized by that Act, to prevent such interference as prejudicial, not to Panagra's "corporate welfare," but to the public interest. Of course nothing we have said is to be understood as precluding the Board from considering and deciding, in this or any other proceeding, whether Grace is violating § 408, 49 U.S.C.A. § 488. Nor are we intimating that, should the Board find that Grace is violating §

408 and that Pan American is also improperly using its stock interest in Panagra, the Board may not exercise its statutory powers to rectify the situation in any way it deems wise.[1] It should go without saying that (although the record is already voluminous and seems to cover all these issues) the Board should give all parties the opportunity to offer additional, relevant evidence unless the Board, in the exercise of sound discretion, rules that it is needlessly cumulative.

■ 2. Pan American, in its rehearing petition, concedes that "the overall purpose of the statute is the advancement of the public interest by the promotion of civil air service." That purpose, permeating this case, both before the Board and in this court, serves to dispose of the contention that in our decision we have exceeded our powers of review. Grace, before the Board, objected to the dismissal of the proceeding for want of jurisdiction in the Board; in its petition for review, Grace prayed "for such other relief as to the court may seem just and proper in the circumstances." With increasing emphasis, the Supreme Court has admonished us that, in court review of such administrative orders as this now before us, the public interest looms large.[2] Accordingly, since this is not mere private litigation, overly nice scrutiny of the pleadings and undue stress on alleged estoppels[3] have no place here.[3a]

---

[1] We do not have (as Eastern somewhat recklessly suggests) any "solicitude for Grace."

[2] F. C. C. v. Sanders Bros. Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037; Scripps-Howard Radio v. F. C. C., 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229; F. C. C. v. N. B. C., 319 U. S. 239, 247, 63 S.Ct. 1035, 87 L.Ed. 1374; Ashbacker Radio Corp. v. F. C. C., 326 U.S. 327, 66 S.Ct. 148.

In the Scripps-Howard Radio case, 316 U.S. at pages 14, 15, 62 S.Ct. at page 882, 86 L.Ed. 1229, the Court said: "But these private litigants have standing only as representatives of the public interest. Federal Communications Commission v. Sanders Bros. Radio Station, 309 U.S. 470, 477, 642, 60 S.Ct. 693, 698, 84 L.Ed. 869, 1037. Compare National Licorice Co. v. N. L. R. B., 309 U.S. 350, 362, 363, 60 S.Ct. 569, 576, 84 L.Ed. 799. That a court is called upon to enforce public rights and not the interests of private property does not diminish its power to protect such rights. * * * Courts no

less than administrative bodies are agencies of government. Both are instruments for realizing public purposes."

See Associated Industries v. Ickes, 2 Cir., 134 F.2d 694, for discussion of the development of this doctrine; there (134 F.2d at page 704) we suggested that those who come within the class of persons who may seek review, under review provisions like that here, may be considered "private Attorney Generals."

[3] Grace, before the Board, objected to consideration in this proceeding of its petition No. 744 with respect to § 411, 49 U. S.C.A. § 491. We do not (as Eastern erroneously suggests) instruct the Board to consider § 411, although it may do so if it wishes and although it may be that, in considering Grace's petition No. 707, it may be necessary to deal with much the same issues as would arise under § 411.

It is to be noted that Pan American before the Board referred to "Grace's complaints in Dockets No. 707 and 744, which form the background of this proceeding."

[3a] Cf. Mercoid Corp. v. Mid-Continent

Eastern argues that Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L. Ed. 656, shows that we have illegitimately intruded on the Board's discretion as to the order in which it chooses to consider matters pending before it. But the Supreme Court rejected that same suggestion in Ashbacker Radio Corp. v. Federal Communications Commission, 326 U.S. 327, 66 S.Ct. 148, as the dissenting opinion in that case discloses. The unmistakable fact is that, of recent years, there has been a steady development in Supreme Court decisions of the doctrine that those seeking review of the orders of administrative agencies, under review provisions like § 1006 of this Act, 49 U.S.C.A. § 646, are primarily vindicating the public, not a private, interest.[4] It is our duty to follow the lines laid down by that Court, and we have done so here according to our lights.

■ 3. It is urged that in our discussion of American Power & Light Co. v. Securities & Exchange Commission, 325 U.S. 385, 65 S.Ct. 1254, we neglected the fact that it turned on the extensive powers and duties of the S. E. C. under the Public Utility Holding Company Act which include protection of the interests of investors and therefore authorize administrative scrutiny of the relations between stockholders and their corporations. But that contention disregards the numerous provisions of the Civil Aeronautics Act directing and authorizing the Board, in safeguarding the public interest and in carrying out the declared policy of the Act, to investigate, supervise, and do the needful, with respect to the management and control of air carriers.[5] In the light of those provisions, we reject Pan American's argument that the Board lacks all "power to take the management of a corporation out of the hands of its directors." It was with those provisions in mind that we said that exploration of the issues of alleged "fraud" or "illegality" in the man-

agement and control of Panagra demand the Board's "specialized acquaintance with commercial aviation and its ramifications." Pittsburg, etc., R. Co. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980, involved nothing like the public interest patently here involved; moreover, that case was decided before the recent doctrinal development above noted. We see nothing in Schenley Distillers Corp. v. United States, 66 S.Ct. 247, to induce a different conclusion.

4. Objection is made to the fact that in a footnote we referred to the Latin American Proceeding (Docket No. 525) because this is a matter not in the record before us. The Board in one of its briefs called our attention to the existence and nature of that proceeding. Whether, since it relates to subsequent happenings in the Board affecting the case here, we may not properly consider it is not entirely clear.[6] But we did not, in any way, rest our decision thereon, using it merely to illustrate the obvious point that the Board's long delay in passing on Grace's petition filed December 16, 1941, might, through intervening circumstances, render the Board impotent—should it later take up that petition and decide it in favor of Grace—to do that which would be in the public interest.

■ 5. We were in error in saying in a note to our previous opinion that the Board had told us that in other cases it had treated consents, filed in § 401(h), 49 U.S. C.A. § 481(h) proceedings, as voluntary petitions for extensions under § 401(d). But we adhere to the view that a consent by a carrier to a 401(h) extension proceeding begun by the Board is the legal equivalent of a petition for the same extension initiated by the carrier.

6. To avoid misunderstanding, we repeat that we are not prejudging any of the issues of fact. We have not examined the record as to the merits. That is the Board's function.

Petitions for rehearing denied.

Co., 320 U.S. 661, 670, 64 S.Ct. 268, 88 L.Ed. 376.

[4] See cases cited, supra, note 2.

[5] See §§ 407, 408, 409, 411, 412, 413, 415, 49 U.S.C.A. §§ 487, 488, 489, 491,

492, 493, 495; cf. § 1(2), 49 U.S.C.A. § 401(2).

[6] Cf. Public Utilities Commission v. United Fuel Gas Co., 317 U.S. 456, 466, 63 S.Ct. 369, 87 L.Ed. 396; Patterson v. Alabama, 294 U.S. 600, 607, 55 S.Ct. 575, 79 L.Ed. 1082.